STATE OF NORTH CAROLINA v. RICHARD GORDON

No. 39

(Filed 6 May 1975)

1. **Constitutional Law § 30— nine months between offense and trial — no denial of speedy trial**

Defendant was not denied his right to a speedy trial where nine months elapsed between the offense and trial since the State offered evidence of congested court calendars, defendant acquiesced in the

State v. Gordon

delay for eight months before asking for a speedy trial, and defendant failed to show what two possible witnesses would have testified if they had lived until the time of the trial.

**2. Searches and Seizures § 4— search under warrant of adjacent apartment — standing of defendant to challenge evidence**

Defendant's rights were not violated by a search under warrant of an apartment located next door to defendant's apartment and by seizure of guns which defendant had placed in that apartment, and defendant had no standing to challenge introduction into evidence of the seized guns where defendant was not on the premises at the time of the contested search and seizure, defendant had no proprietary or possessory interest in the premises nor had he ever claimed any, and defendant was not charged with an offense that included, as an essential element of the offense charged, possession of the seized evidence at the time of the contested search and seizure.

**3. Criminal Law § 76— in-custody statement — voluntariness**

Evidence was sufficient to support the trial court's finding that an in-custody inculpatory statement made by defendant to police officers after his arrest without a warrant was free and voluntary where such evidence tended to show that defendant signed a waiver and was questioned for ten or fifteen minutes about six hours after his arrest at which time he denied any knowledge of the murders, six hours later he made a full confession after being questioned for twenty-five or thirty minutes, and there was ample evidence that defendant was never promised anything or threatened in any way.

**4. Criminal Law § 84; Searches and Seizures § 1— items seized from crime scene and incident to lawful arrest — standing of defendant to challenge search**

Defendant lacked standing to complain of any search, legal or otherwise, which yielded bullet fragments, a small shot pellet, an empty 30-30 cartridge, a fired shotgun shell, a box of shotgun shells, a box of 30-30 shells, a brown bag, and a .32 caliber pistol where all items except the pistol were found at or near the crime scene and in the apartment located next to defendant's, and the pistol was seized incident to a lawful arrest and was in plain view of the arresting officer.

**5. Homicide § 21— death by shooting — first degree murder — sufficiency of evidence**

Evidence in a first degree murder trial was sufficient to be submitted to the jury, though the evidence did not show that the shots fired by defendant from a .32 caliber pistol were the ones that killed the two victims, where the evidence did show that defendant was present at the scene for the purpose of aiding and abetting his companions in the commission of the crimes, and that he actively participated by firing his pistol into the car where one of the decedents was sitting.

**6. Constitutional Law § 36; Homicide § 31— first degree murder — death penalty — constitutionality**

Sentence of death imposed in this first degree murder prosecution was constitutional.

Chief Justice SHARP and Justices COPELAND and EXUM dissenting as to the death sentence.

APPEAL by defendant from *Ervin, J.*, at the 13 May 1974 Schedule "B" Criminal Session of MECKLENBURG Superior Court.

On indictments proper in form, defendant was convicted of the first degree murders of Steve Charles Helton and Sharon Williams. Defendant appeals from judgments imposing a sentence of death in each case.

The evidence for the State tends to show: On Friday, 17 August 1973, Steve Charles Helton was the evening manager and Sharon Williams was an employee of the Burger Chef Restaurant on Wilkinson Boulevard in Charlotte. The restaurant closed about 11:30 p.m. After locking the doors, Steve, Sharon, and two other employees cleaned the inside of the restaurant. At 11:53 p.m., they "clocked out," went outside, and picked up trash for a few minutes. Steve and Sharon then went to his automobile at the back of the parking lot and the other two employees, Stephanie Lynn Strawser and Donna Faye Bartlett, went to their automobiles at the front of the parking lot. As Stephanie and Donna were starting their automobiles, they saw flashes and heard popping noises and a sound "like a cannon" coming from the area of Steve's car. Stephanie and Donna saw two or three figures run from behind a dumpster to the corner of another building. Donna exclaimed, "Stephanie, they have been shot." The two girls were afraid to go to Steve's car because of the possibility there might "still be people back there." Instead, they went to a nearby grocery store, called the police, and then returned to the Burger Chef with three "bag boys." There they found Steve lying beside his car and Sharon slumped over in the front seat.

Officer J. A. Williams of the Charlotte Police Department arrived at the scene about 12:05 a.m. The window on the passenger side was broken and there were small indentations on the outside of the car door, just below the window, which appeared to be caused by shotgun pellets. There was a bullet hole about the center of the windshield and a large quantity of blood and glass inside the car.

Officer H. J. Booth of the Charlotte Police Department arrived on the scene about 12:07 a.m. He examined Steve and Sharon but was unable to detect a pulse.

Other officers discovered fresh footprints in a red mud field behind the building next to the Burger Chef and followed them to a railroad track nearby. There they found an empty 12-gauge shotgun shell. Officers also discovered an empty 30-30 cartridge case in front of Steve's car. Someone had pulled wires loose about the engine of this car.

Ellen Barbara Gilmore had known defendant for about one year. She lived with her sister at 2725 Craddock Circle in Apartment 3, and he lived at the same address in Apartment 2. On 17 August 1973, she saw defendant about 8:30 p.m. She did not see him any more that night but had a conversation with him at about midnight through an open door between the apartments. Prior to 17 August, defendant sometimes kept a rifle in a zipper bag and a handgun in Ellen's living room closet. On Saturday, 18 August, she looked in the zipper bag in the closet and observed a sawed-off shotgun, a handgun and a "long gun."

At about 1:30 a.m. on 21 August 1973, approximately twenty Charlotte police officers, acting on an informant's tip, went to 2725 Craddock Circle and surrounded Apartments 2 and 3. Eight officers with a search warrant entered and searched Apartment 3. In the living room closet they found a .22-caliber rifle, a 30-30 rifle, and a sawed-off 12-gauge shotgun. Shortly thereafter, approximately six officers entered Apartment 2. Defendant, who answered the door, was immediately arrested. The officers also arrested Ronnie Young and two women who were there. The officers found a .32-caliber pistol on a chair near defendant. They also found a "nightstick" belonging to a patrolman which had been missing about two weeks.

Lori Ann Alexander, who had been living with defendant in his apartment since late July 1973, was one of the women arrested there on this occasion. She saw defendant and Ronnie Young leave about 9:30 p.m. on the night of the crimes and saw them return about 12:00 or 12:30 a.m. They did not say where they were going. Ronnie Young and defendant returned together, followed shortly by Zack McCain. Ronnie left after about fifteen minutes and Zack left shortly thereafter.

Lori Ann, defendant, Ronnie Young, and another woman were taken to the police station at approximately 3:00 a.m. on

21 August. At the police station, defendant was given the usual *Miranda* warnings, and signed a waiver of his rights about 9:45 or 10:00 a.m. At that time, defendant denied knowing anything about the murders. Officers questioned defendant at this time for about fifteen minutes. At approximately 2:30 p.m., the officers returned to defendant with a signed statement made by Zack McCain that implicated defendant in the murders. Defendant again waived his rights and signed a full confession at 3:10 p.m. to the effect that he went to the Burger Chef on the night of 17 August with Zack McCain and Ronnie Young, intending to "snatch a money bag" when the restaurant closed. He stated that before going to the Burger Chef they went next door to Apartment 3 and procured a 30-30 rifle, a .32-caliber pistol, and a 12-gauge sawed-off shotgun which he had previously left there. They then went to the Burger Chef and hid behind the dumpster for about an hour until the restaurant closed. They knew the car Steve was driving and Zack pulled some wires loose so the car would not start. While Steve was putting some trash in the dumpster, Zack saw that he did not have a money-bag and said, "God Dammit" and shot the 30-30 rifle twice. Ronnie Young fired the shotgun at the glass in the door of Steve's car and defendant emptied the .32-caliber pistol at the car. They all then ran down the railroad track and continued to defendant's apartment. There defendant, who had expected no shooting, told Zack to get out of his house and Zack left.

Dr. Hobart Wood, the medical examiner for Mecklenburg County, performed an autopsy on the bodies of the victims at approximately 9:00 a.m. on 18 August. He testified that death of each victim was extremely rapid, if not instantaneous, caused from wounds received from a .30-caliber rifle bullet. There were also several small pellet-type wounds on Sharon's body. Dr. Wood did not find any bullet in either body that he would describe as a .32-caliber bullet.

Frederick Mark Hurst, assigned to the Crime Laboratory, Firearms and Tool Markings Division, of the State Bureau of Investigation, performed microscopic tests and test-firings with the 30-30 rifle and sawed-off shotgun. These tests showed that, in his opinion, the empty 30-30 cartridge case found near the scene of the shooting and bullet fragments taken from the bodies of the victims were fired from defendant's 30-30 rifle, and that the empty shotgun shell found on the railroad track was fired from defendant's sawed-off shotgun.

Defendant offered no evidence.

Other facts pertinent to decision are set out in the opinion.

*Attorney General James H. Carson, Jr., and Assistant Attorneys General Lester V. Chalmers, Jr., and Sidney S. Eagles, Jr., for the State.*

*Lacy W. Blue for defendant appellant.*

MOORE, Justice.

[1] Before pleading to the bills of indictment, defendant moved to dismiss for failure of the State to afford him a speedy trial. Defendant assigns as error the denial of this motion.

In support of his motion, defendant introduced death certificates of two possible witnesses, Isaac Harris and Mattie Howze. Harris was shot on 15 January 1974, while robbing a store, and died on 19 January 1974. Howze was doused with gasoline and set on fire on 29 December 1973, and died on 30 December 1973. Defendant contends that had his cases been tried earlier, these two persons might have been helpful in the presentation of his defense. He offered no evidence as to what either of these persons would have testified had they been called as witnesses.

In opposition to defendant's motion to dismiss, the State offered the testimony of Thomas F. Moore, Jr., the District Attorney for the Twenty-Sixth Judicial District, who testified in part that from 21 August 1973 to 20 May 1974 approximately 70 weeks of criminal court were held in Mecklenburg County, with an average of about 100 persons awaiting trial at all times; that during this period approximately 1200 cases were disposed of, including between 150 to 200 requiring jury trials; that it takes about four to six months to bring a jail case to trial in the county because of the condition of the docket; that it took two to three months longer to bring this case to trial because of pretrial publicity adverse to the defendant; that the delay was necessary in order to secure a fair trial for the defendant; that there were other criminal cases that did not receive the publicity this case received; that additional time was needed to prepare this case because of the technical legal aspects involved; that the availability of Judge Ervin to try the case, because of the legal technicalities involved, was an important factor involved in setting the case for trial.

State v. Gordon

The following facts were stipulated by the two Assistant District Attorneys representing the State and counsel for defendant:

"1. That the defendant, Richard Gordon, was arrested on this charge or these charges on August 21, 1973, and has been held in custody without privilege of bond since that date.

"2. That he was given a preliminary hearing in the Mecklenburg County District Court on September 26, 1973, and was bound over to Superior Court for trial on these charges at that time; that no bond was permitted by the District Court.

"3. That on November 5, 1973, the Grand Jury of Mecklenburg County returned a true bill against the defendant, Richard Gordon, in each case.

"4. That the defendant made a motion for speedy trial on April 11, 1974, and that the case was called for trial on Monday, May 20, 1974."

Based on the stipulation, the death certificates, and the testimony of District Attorney Moore, the trial judge made detailed findings of fact and then concluded as a matter of law:

"1. That the defendant has not been deprived of a speedy trial in the constitutional sense and that the defendant is not entitled to have this case dismissed, nor is he entitled to any other relief by virtue of his contention that he has been denied a speedy trial.

"2. That the evidence fails to disclose that the State has acted wilfully or that the State has been guilty of any neglect in its handling of the matter, the Court finding that the case has been called for trial on the first occasion on which it has been docketed and that there is no showing that the State handled this case in any fashion other than in the normal fashion in which serious criminal cases are handled and disposed of in Mecklenburg County Superior Court; that the defendant has failed to show that the fact that the case has not been called for trial prior to May 20, 1974, has in any wise prejudiced the defendant or that he has in any wise been harmed by virtue of the fact that the case was not called for trial prior to this date."

State v. Gordon

The right to a speedy trial has been considered by this Court in many cases, including *State v. Frank*, 284 N.C. 137, 200 S.E. 2d 169 (1973) ; *State v. Harrell*, 281 N.C. 111, 187 S.E. 2d 789 (1972) ; *State v. Ball*, 277 N.C. 714, 178 S.E. 2d 377 (1971) ; *State v. Johnson*, 275 N.C. 264, 167 S.E. 2d 274 (1969) ; *State v. Cavallaro*, 274 N.C. 480, 164 S.E. 2d 168 (1968) ; *State v. Hollars*, 266 N.C. 45, 145 S.E. 2d 309 (1965).

The Supreme Court of the United States has also considered the constitutional guaranty of a speedy trial in various cases, including *United States v. Marion*, 404 U.S. 307, 30 L.Ed. 2d 468, 92 S.Ct. 455 (1971) ; *Dickey v. Florida*, 398 U.S. 30, 26 L.Ed. 2d 26, 90 S.Ct. 1564 (1970) ; *Smith v. Hooey*, 393 U.S. 374, 21 L.Ed. 2d 607, 89 S.Ct. 575 (1969) ; *Klopfer v. North Carolina*, 386 U.S. 213, 18 L.Ed. 2d 1, 87 S.Ct. 988 (1967) ; *United States v. Ewell*, 383 U.S. 116, 15 L.Ed. 2d 627, 86 S.Ct. 773 (1966) ; *Pollard v. United States*, 352 U.S. 354, 1 L.Ed. 2d 393, 77 S.Ct. 481 (1957) ; *Beavers v. Haubert*, 198 U.S. 77, 49 L.Ed. 950, 25 S.Ct. 573 (1905).

The length of delay is never *per se* determinative, although a delay of nine months, as in the present case, could contravene the defendant's right to a speedy trial under some circumstances. *State v. Brown*, 282 N.C. 117, 191 S.E. 2d 659 (1972).

The constitutional right to a speedy trial prohibits arbitrary and oppressive delays by the prosecution. *State v. Brown, supra; State v. Spencer*, 281 N.C. 121, 187 S.E. 2d 779 (1972). " . . . But this right is necessarily relative and is consistent with delays under certain circumstances. [Citation omitted.]" *State v. Spencer, supra.*

As we said in *State v. Harrell, supra:*

"The word *speedy* cannot be defined in specific terms of days, months or years, so the question whether a defendant has been denied a speedy trial must be answered in light of the facts in a particular case. Four factors should be considered in determining the reasonableness of a delay: the length of the delay, the reason for the delay, prejudice to the defendant, and waiver by the defendant. [Citations omitted.]"

The congestion of criminal court dockets has been consistently recognized as a valid justification for delay. Crowded dockets, lack of judges or lawyers, and other factors, make some

delays inevitable. *State v. Brown, supra; State v. George,* 271 N.C. 438, 156 S.E. 2d 845 (1967).

A delay from 21 August 1973, the date on which defendant was arrested, until 20 May 1974, the date of the trial, in view of the congested docket in Mecklenburg County, could hardly be considered "willful or oppressive." *Pollard v. United States, supra.* The burden is clearly on the accused to show that the delay was due to the neglect or willfulness of the prosecution. *State v. Brown, supra; State v. Ball, supra; State v. Hatcher,* 277 N.C. 380, 177 S.E. 2d 892 (1970) ; *State v. Hollars, supra.* Defendant has failed to carry that burden.

Defendant here apparently acquiesced in the delay until 11 April 1974—the date on which he first asked for a speedy trial. " . . . A defendant who has himself caused the delay, or acquiesced in it, will not be allowed to convert the guarantee, designed for his protection, into a vehicle in which to escape justice. [Citations omitted.]" *State v. Johnson, supra.*

The record is devoid of any evidence of prejudice although defendant did state that he had expected to call the two deceased persons as possible witnesses. He did not attempt to show what he expected to prove by them had they been available. Nothing in the record suggests that his ability to present his defense was in any way impaired by the delay or by the death of those persons.

Defendant's contention that he has been denied his right to a speedy trial is without merit. This assignment is overruled.

[2] Prior to 17 August 1973, defendant sometimes left a rifle or pistol in Apartment 3, occupied by the two sisters, Ellen Gilmore and Brenda Barber, adjoining Apartment 2 in which defendant lived. On 18 August a shotgun, a pistol and a "long gun" in a zipper bag were seen by Ellen Gilmore in the closet of Apartment 3. On 21 August police officers, armed with a search warrant, went to Apartment 3, located and seized these guns. At trial they were identified by Ellen Gilmore as the ones or similar to the ones put in her closet by defendant. The State offered these guns in evidence. Defendant's counsel objected and moved to suppress for the reason that they had been seized in the course of an unlawful and unconstitutional search. This motion was overruled. The denial of this motion is the basis for defendant's second assignment of error.

Defendant contends that although the officers had a search warrant it was not introduced in evidence, and also, contrary to the State's contention, that he does have standing to challenge the introduction into evidence of the 30-30 rifle and other weapons seized in Apartment 3. " . . . The immunity to unreasonable searches and seizures is a privilege personal to those whose rights thereunder have been infringed. They alone may invoke it against illegal searches and seizures. . . . " *State v. Craddock,* 272 N.C. 160, 158 S.E. 2d 25 (1967).

As stated by Chief Justice Burger in *Brown v. United States,* 411 U.S. 223, 36 L.Ed. 2d 208, 93 S.Ct. 1565 (1973) :

" . . . [T]here is no standing to contest a search and seizure where, as here, the defendants: (a) were not on the premises at the time of the contested search and seizure; (b) alleged no proprietary or possessory interest in the premises; and (c) were not charged with an offense that includes, as an essential element of the offense charged, possession of seized evidence at the time of the contested search and seizure. . . . "

The search warrant in the present case, although not introduced in evidence at trial, was introduced on the *voir dire* hearing and complied with the provisions of G.S. 15-26. *See State v. Vestal,* 278 N.C. 561, 180 S.E. 2d 755 (1971). Regardless of the validity of the search warrant, however, defendant had no standing to contest the search and seizure in this case. He was not on the premises at the time of the contested search and seizure; he had no proprietary or possessory interest in the premises, nor had he ever claimed any; and he was not charged with an offense that includes, as an essential element of the offense charged, possession of the seized evidence at the time of the contested search and seizure. Hence, the rights of defendant were not invaded by the search of Apartment 3. This assignment is overruled.

[3] Defendant next assigns as error the admission into evidence, over objection, of an in-custody inculpatory statement made by him to Charlotte Police Officers Gibson and Thompson after his arrest without a warrant. On defendant's objection to the introduction of the written statement, the trial court conducted an extensive *voir dire* hearing. Officer Gibson, Officer Travis, and the defendant testified. The court, considering this testimony and, by stipulation, the testimony of other officers

who had testified prior to the *voir dire* hearing, made detailed findings of fact, covering nine pages in the record, and in part concluded:

"That the defendant was properly advised of his constitutional rights in accordance with *Miranda v. Arizona;*

"That considering the totality of the circumstances, the defendant's confession was freely, understandingly, knowingly, and voluntarily made and that it was not the result of undue influence, compulsion, duress, physical abuse, or promise of leniency, and the State is entitled to offer said confession in evidence against the defendant.

"That the defendant knowingly waived his right to counsel, both orally and in writing."

The evidence on the *voir dire* hearing fully supports the findings that the defendant's confession was free and voluntary. Defendant was questioned on three occasions on 21 August. An identification card was filled out between 6:00 and 7:00 a.m. At that time he was not questioned concerning the crimes. At 9:45 a.m., defendant signed a waiver and was asked questions for ten to fifteen minutes. He then denied any knowledge of the murders. Defendant made a full confession about 3:15 p.m., after being questioned for twenty-five to thirty minutes. There was ample evidence that defendant was never promised anything or threatened in any way, and that defendant completely volunteered his statement. These findings, having support in the evidence, are conclusive on appeal. *State v. Thompson,* 285 N.C. 181, 203 S.E. 2d 781 (1974); *State v. Frazier,* 280 N.C. 181, 185 S.E. 2d 652 (1972); *State v. Hill,* 276 N.C. 1, 170 S.E. 2d 885 (1969); *State v. Vickers,* 274 N.C. 311, 163 S.E. 2d 481 (1968).

When the officers arrested defendant they had reasonable grounds to believe that defendant had committed the two murders and would evade arrest if not immediately taken into custody. Under these circumstances the arrest was proper, and the confession was in no wise tainted by an illegal arrest. G.S. 15-41 (repealed by Session Laws 1973, Chapter 1286, Section 26, effective July 1, 1975); *State v. Dickens,* 278 N.C. 537, 180 S.E. 2d 844 (1971); *State v. Alexander,* 279 N.C. 527, 184 S.E. 2d 274 (1971).

Assuming, *arguendo*, that the arrest was illegal, this would not have made the statement *ipso facto* involuntary and inadmis-

sible. As Justice Branch stated in an excellent discussion of this point in *State v. Moore,* 275 N.C. 141, 166 S.E. 2d 53 (1969) :

> "Both reason and weight of authority lead us to hold that every statement made by a person in custody as a result of an illegal arrest is not *ipso facto* involuntary and inadmissible, but the facts and circumstances surrounding such arrest and the in-custody statement should be considered in determining whether the statement is voluntary and admissible. *Voluntariness remains as the test of admissibility.*" (Emphasis added.)

The court, after carefully reviewing all the circumstances, found that the statement in question was voluntarily made. This assignment is overruled.

[4] Defendant objected to the introduction into evidence of two fragments of bullets, a small shot pellet, an empty 30-30 cartridge, a fired shotgun shell, a box of shotgun shells, a box of 30-30 shells, a brown bag, and a .32-caliber pistol. Defendant contends that it was error to admit these items because they were obtained by an unreasonable search and seizure.

The fragments of bullets and the shot introduced were taken from the bodies of the victims. The empty 30-30 cartridge was found at the scene of the shooting immediately after the shooting occurred. Tracks leading from the scene of the shooting led to where the empty shotgun shell was found. Both the empty 30-30 cartridge and the empty shotgun shell were identified as having been fired from the rifle and shotgun found in Apartment 3. The box of shotgun shells and the box of 30-30 cartridges were found with the shotgun and rifle. The .32-caliber pistol was found in Apartment 2 on a chair about two feet from where defendant was standing when arrested.

First, we note that, except for the .32-caliber pistol, these items were so located that defendant lacked standing to complain of any search, legal or otherwise. *Brown v. United States, supra; State v. Craddock, supra.* As to the .32-caliber pistol, it was seized incident to a lawful arrest and was in plain view of the arresting officer and was thus properly seized. *Chimel v. California,* 395 U.S. 752, 23 L.Ed. 2d 685, 89 S.Ct. 2034, *reh. den.* 396 U.S. 869, 24 L.Ed. 2d 124, 90 S.Ct. 36 (1969) ; *Harris v. United States,* 390 U.S. 234, 19 L.Ed. 2d 1067, 88 S.Ct. 992 (1968) ; *Preston v. United States,* 376 U.S. 364, 11 L.Ed. 2d 777,

84 S.Ct. 881 (1964); *State v. Rigsbee,* 285 N.C. 708, 208 S.E. 2d 656 (1974); *State v. Carey,* 285 N.C. 509, 206 S.E. 2d 222 (1974). We find no merit whatever in this contention.

[5] At the close of the evidence defendant moved for judgment as of nonsuit. This motion was overruled and defendant assigns this as error.

"If there is any evidence tending to prove the fact of guilt or which reasonably conduces to this conclusion as a fairly logical and legitimate deduction, and not such as merely raises a suspicion or conjecture of guilt, it is for the jury to say whether they are convinced beyond a reasonable doubt of the fact of guilt." 2 Strong, N. C. Index 2d, Criminal Law § 106 (1967). *State v. Williams,* 286 N.C. 422, 212 S.E. 2d 113 (1975); *State v. Bell,* 285 N.C. 746, 208 S.E. 2d 506 (1974). An examination of the evidence in this case convinces us that it was properly submitted to the jury.

While the evidence does not show that the shots fired by defendant from the .32-caliber pistol were the ones that killed Sharon Williams and Steve Helton, the record discloses that the defendant was present at the scene for the purpose of aiding and abetting his companions in the commission of the crimes, and that he actively participated by firing his pistol into the car where one of the deceased was sitting. This was sufficient to require the submission of his cases to the jury. *See State v. Rankin,* 284 N.C. 219, 200 S.E. 2d 182 (1973); *State v. Terry,* 278 N.C. 284, 179 S.E. 2d 368 (1971); *State v. Johnson,* 272 N.C. 239, 158 S.E. 2d 95 (1967). This assignment is overruled.

[6] Defendant finally contends that the death penalty was unconstitutional at the time of the commission of these crimes. We have carefully considered and rejected defendant's argument in numerous cases; *e.g., State v. Noell,* 284 N.C. 670, 202 S.E. 2d 750 (1974); *State v. Jarrette,* 284 N.C. 625, 202 S.E. 2d 721 (1974); *State v. Waddell,* 282 N.C. 431, 194 S.E. 2d 19 (1973). We reaffirm our position as there set out. No useful purpose would be served by further elaboration here.

It is noted that the court's charge was not brought forward in the record. Therefore, it is presumed that the jury was clearly charged as to the law arising from the evidence as required by G.S. 1-180. 3 Strong, N. C. Index 2d, Criminal Law § 158 (1967); *State v. Moore,* 276 N.C. 142, 171 S.E. 2d 453 (1970); *State v. Cooper,* 273 N.C. 51, 159 S.E. 2d 305 (1968).

In view of the seriousness of the charges, we have carefully examined each of defendant's assignments of error. Our examination of the entire record discloses that the defendant has had a fair trial, free from prejudicial error.

No error.

Chief Justice SHARP dissents as to the death sentence and votes to remand for the imposition of a sentence of life imprisonment for the reasons stated in her dissenting opinion in *State v. Avery,* 286 N.C. 459, 472, 212 S.E. 2d 142, 149 (1975).

Justice COPELAND dissents as to death sentence and votes to remand for imposition of a sentence of life imprisonment for the reasons stated in his dissenting opinion in *State v. Williams,* 286 N.C. 422, 437, 212 S.E. 2d 113, 122 (1975).

Justice EXUM dissents from that portion of the majority opinion which affirms the death sentence and votes to remand this case in order that a sentence of life imprisonment can be imposed for the reasons stated in his dissenting opinion in *State v. Williams,* 286 N.C. 422, 439, 212 S.E. 2d 113, 121 (1975), other than those relating to the effect of Section 8 of Chapter 1201 of the 1973 Session Laws.