STATE OF NORTH CAROLINA v. DAVID BENJAMIN SMITH, ALIAS DAVID BENJAMIN McCULLOUGH AND BOBBY ORLANDO FOSTER

No. 6

(Filed 29 January 1976)

1. **Constitutional Law § 30— speedy trial — determining factors**

Interrelated factors to be considered in determining whether a defendant has been denied his constitutional right to a speedy trial are: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) prejudice to defendant resulting from the delay.

2. **Constitutional Law § 30— eleven months between arrest and trial — no denial of speedy trial**

A delay of eleven months between defendant's arrest and trial was not unreasonable and was not due to the neglect or wilfulness of the prosecution where the record indicated that the delay in prosecution was due to congested criminal dockets, good faith efforts to obtain custody of absent codefendants, and understandable difficulty in locating out-of-state witnesses, one of whom was a fugitive from justice.

3. **Constitutional Law § 21; Searches and Seizures § 1— warrantless seizure — contraband in plain view**

The guarantee against unreasonable searches and seizures does not prohibit a warrantless seizure where the contraband subject matter is fully disclosed and open to the eye and hand. U. S. Constitution, IV Amendment.

4. **Criminal Law § 84; Searches and Seizures § 1— warrantless seizure of revolver — weapon in plain view in vehicle**

The trial court in a first degree murder prosecution did not err in allowing into evidence a revolver seized without a warrant from the vehicle in which one defendant was the driver and the other defendant was a passenger where a patrolman stopped the car which was being operated in a careless and reckless manner, the patrolman glanced through the window on the driver's side of the vehicle, and he immediately observed the butt of the revolver under the center arm rest of the car.

5. **Criminal Law § 90— impeachment of State's own witness — hostile witness — scope of cross-examination**

In criminal cases in N. C. the district attorney may not impeach a State's witness by evidence that his character is bad or that he has made prior statements inconsistent with or contradictory to his testimony; however, the trial judge in his discretion may allow the prosecutor to cross-examine a hostile or unwilling witness for the purpose of refreshing his recollection or awakening his conscience, thus enabling him to testify correctly, but the trial judge offends the rule that a witness may not be impeached by the party calling him

State v. Smith

and so commits error if he allows a party to cross-examine his own witness solely for the purpose of proving him to be unworthy of belief.

6. **Criminal Law § 90— State's witness — impeachment by district attorney — error**

The trial court erred in allowing the district attorney to ask "leading questions" and to "cross-examine" a witness in an effort to demonstrate to the jury that the witness was lying when he stated he "could not remember" having testified at the first trial to certain events and conversations incriminating the defendants, since the State thereby sought not only to impeach the credibility of its own witness but also attempted to force the witness to give the jury the same account of events he had given at the first trial.

7. **Criminal Law § 90— impeachment of own witness — evidence as to paper writing inadmissible**

The trial court erred in allowing the district attorney to ask a State's witness leading questions which were calculated to impeach the witness and which indirectly placed before the jury a paper writing which purportedly was a statement made by the witness to a police officer several months after the crime.

8. **Criminal Law § 90— hostile witness — surprise — impeachment of own witness**

The rule which allows impeachment where the party calling the witness has been misled and surprised or entrapped to his prejudice was not applicable in the instant case where, sometime prior to calling the witness Thomas, the district attorney had substantial reason to believe that Thomas would repudiate or disavow his prior testimony if called upon to testify, and the prosecutor therefore could not have been genuinely surprised or taken unawares by the testimony of the witness.

APPEAL by defendants from *Falls, J.,* 11 November 1974 Session, MECKLENBURG Superior Court.

This case was first tried on 30 September 1974 and resulted in a mistrial when the jury was unable to agree.

In Case No. 74-CR-1598 defendant David Benjamin Smith is charged with the murder of Arthur William Hawkins, and in Case No. 74-CR-1599 said defendant is charged with the murder of Norman Bruce Wagstaff.

In Case No. 74-CR-1600 defendant Bobby Orlando Foster is charged with the murder of Norman Bruce Wagstaff, and in Case No. 74-CR-1601 this defendant is charged with the murder of Arthur William Hawkins.

All four bills of indictment allege that the murders occurred in Mecklenburg County on 11 August 1973. The four cases were consolidated for trial.

The State's evidence tends to show that in July 1973 defendants Smith, Foster and a man named James Thomas went to the Days Inn Motel at Tuckaseegee Road in Charlotte, riding in a 1971 model black Oldsmobile. They discussed robbing this motel. On 7 August 1973 defendant Foster, together with Edna Katrina Felder, Henry Harris, and Annie Mae Harris registered at this motel and, during the course of their stay, visited the novelty shop near the check-in desk and observed that a guard was on duty with the check-in clerk. Henry Harris inquired whether the guard stayed all night, and the guard said, "Yes, I stay."

On Friday, 10 August 1973, a man named Robert Davis was in the company of Henry Harris and defendants Smith and Foster. These people were also seen together on that date by Belinda Harris.

During the early morning hours of 11 August 1973, defendants Smith and Foster, with Belinda Harris accompanying them, left a discotheque in a black automobile and, after changing cars, went to the Days Inn Motel on Tuckaseegee Road, ostensibly to pick up a girl. Smith and Foster went into the motel, and Belinda Harris remained in the car. She could not see where they went but soon heard two or three or more sounds that she thought were car backfires in the distance. Shortly thereafter defendants returned to the car. They rode around awhile and finally went home about 4 or 5 a.m. that morning.

At 2:45 a.m. on 11 August 1973 one David Wayne Jennings went to the desk at the Days Inn Motel on Tuckaseegee Road where he found two men lying on the floor, one of whom had on the uniform of a security guard. Jennings called the police and Lt. McGraw arrived on the scene about 3 a.m. Officer McGraw determined that Arthur William Hawkins, the security guard, had been shot and was dead. The other man was Norman Bruce Wagstaff, the night clerk. He was gasping for breath and later died as a result of gunshot wounds. Hawkins, the security guard, was wearing a holster but had no gun and no wallet. The record shows that Wagstaff went on duty as night clerk at the front desk between 12:30 and 1:00 a.m. that evening and that Hawkins was on duty as security guard that evening and had a 7-shot Burgo pistol in his holster.

On 12 August 1973 defendants Smith and Foster, accompanied by Belinda Harris, Delton Harris and two small children,

left Charlotte for New York City in a black Oldsmobile. Two guns were in the car: A .32 caliber, white handle, 7-shot revolver and a .38 caliber revolver. On 30 August 1973 Trooper Sinopoli of the New Jersey State Police stopped a 1972 Oldsmobile with North Carolina license plates on the New Jersey Turnpike for a traffic violation. Defendants Smith and Foster were in the car. The trooper found a .32 caliber Burgo, Model 108, Serial No. 112195, 7-shot pistol in the car. One of the bullets taken from the body of one of the victims had been fired from this pistol. This identical pistol, identified by make, model and serial number, was purchased by Arthur William Hawkins from Fox Jewelry and Loan in Jacksonville, Florida, on 15 September 1965.

Defendants offered no evidence. The jury convicted defendant Smith of first degree murder of Norman Bruce Wagstaff in Case No. 74-CR-1599 and first degree murder of Arthur William Hawkins in Case No. 74-CR-1598. Smith was sentenced to death in each case.

The jury convicted defendant Foster of first degree murder of Norman Bruce Wagstaff in Case No. 74-CR-1600 and first degree murder of Arthur William Hawkins in Case No. 74-CR-1601. He was sentenced to death in each case.

From judgments pronounced each defendant appealed to the Supreme Court.

*Shelley Blum and Bart William Shuster for defendant appellants.*

*Rufus L. Edmisten, Attorney General, and Charles M. Hensey, Assistant Attorney General, for the State of North Carolina.*

HUSKINS, Justice.

Defendant Smith moved to dismiss the murder charges against him on the ground that his constitutional right to a speedy trial had been denied. Denial of the motion constitutes his first assignment of error.

In support of his motion Smith filed an affidavit asserting that the trial delay was due to the efforts by the State to strengthen its case; that this delay prejudiced his defense in that his incarceration without privilege of bond made it im-

State v. Smith

possible for him to contact witnesses; that it compounded the already difficult task of maintaining contact with elusive, unnamed out-of-state witnesses; and that the passage of time dimmed the memories of his unidentified witnesses, including a possible alibi witness.

In opposition to Smith's motion the State on voir dire offered the testimony of Thomas F. Moore, Jr., District Attorney for the Twenty-sixth Judicial District. Mr. Moore testified that determining when a case is "ripe" for trial involves such factors as the complexity of the case, the availability of witnesses, and the pending case load; that the primary reason for the delay in scheduling this case for trial was the State's desire to try defendants Smith, Foster and Harris together, and the State had great difficulty in obtaining custody of Smith's codefendants who had to be extradited from New York and South Carolina. The district attorney further testified that the criminal case backlog in Mecklenburg County numbered between seven and eight hundred during the time defendant Smith was in custody.

The State also offered the testimony of the Assistant District Attorney, Peter S. Gilchrist. He enumerated other factors bearing upon the delay, to wit: The impossibility, in light of overcrowded calendars, of trying more than one "major crime" at any one term of court; the necessity for continued investigation of the case; and the difficulty in locating important State's witnesses, one of whom was a fugitive from justice and unavailable until one week before trial.

It was stipulated that defendant was arrested on October 9 or 10, 1973, and has been in custody without bond since that date; that defendant was indicted on 7 January 1974, defendant Harris was extradited from South Carolina on 13 August 1974, and defendant Foster from New York on 12 July 1974; that defendant Smith requested a speedy trial orally in early May and in writing on 24 May 1974; that defendant's motion for a speedy trial was filed on 12 July 1974 and an affidavit in support of the motion was filed on 30 July 1974; that Smith's counsel informed the district attorney's office on numerous occasions that the defense might consist of an alibi and that the passage of time would tend to injure Smith's ability to defend himself due to loss of memory. It was further stipulated that there were approximately seventy weeks of criminal trials

in Mecklenburg Superior Court between 7 January and 30 September 1974.

On the basis of the evidence produced on voir dire the trial court ruled that the State's reasons for the delay were reasonable and denied defendant's motion. We think this ruling was correct.

[1] Interrelated factors to be considered in determining whether a defendant has been denied his constitutional right to a speedy trial are: (1) The length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) prejudice to defendant resulting from the delay. *Barker v. Wingo,* 407 U.S. 514, 33 L.Ed. 2d 101, 92 S.Ct. 2182 (1972); *State v. Hill,* 287 N.C. 207, 214 S.E. 2d 67 (1975); *State v. Gordon,* 287 N.C. 118, 213 S.E. 2d 708 (1975); *State v. O'Kelly,* 285 N.C. 368, 204 S.E. 2d 672 (1974); *State v. Frank,* 284 N.C. 137, 200 S.E. 2d 169 (1973); *State v. Brown,* 282 N.C. 117, 191 S.E. 2d 659 (1972); *State v. Harrell,* 281 N.C. 111, 187 S.E. 2d 789 (1972); *State v. Johnson,* 275 N.C. 264, 167 S.E. 2d 274 (1969).

[2] The question whether a defendant has been denied a speedy trial must be answered in light of the facts in the particular case. The instant case involves a delay of eleven months from time of defendant's arrest to commencement of his trial. The length of the delay is not *per se* determinative, and there is no showing that the delay was purposeful or oppressive or by reasonable effort could have been avoided by the State. The right to a speedy trial is necessarily relative, for inherent in every criminal prosecution is the probability of delay. *State v. Neas,* 278 N.C. 506, 180 S.E. 2d 12 (1971). Undue delay which is arbitrary and oppressive or the result of deliberate prosecution efforts "to hamper the defense" violates the constitutional right to a speedy trial. *Barker v. Wingo, supra; State v. Spencer,* 281 N.C. 121, 187 S.E. 2d 779 (1972).

The burden is on an accused who asserts the denial of his right to a speedy trial to show that the delay was due to the neglect or wilfulness of the prosecution. *State v. Hill, supra; State v. Gordon, supra; State v. Johnson, supra.* In the instant case defendant has failed to carry the burden. To the contrary, the record indicates that the delay in the prosecution of this case was due to congested criminal dockets, good-faith efforts to obtain custody of absent codefendants, and understandable

difficulty in locating out-of-state witnesses, one of whom was a fugitive from justice. Such reasons have been recognized consistently as valid justification for delay. *See Barker v. Wingo, supra; State v. Hill, supra; State v. Gordon, supra; State v. Brown, supra.* We conclude that the length of the delay was not unreasonable and the delay itself was not prejudicial to defendant Smith in preparing and presenting his defense. The first assignment of error is overruled.

[4] The next assignment requiring brief discussion concerns the admission of State's Exhibit 3, a 7-shot .32 caliber Burgo revolver. Defendants contend this weapon was the fruit of an illegal search and seizure which renders it inadmissible under the Fourth and Fourteenth Amendments. We now examine the validity of this contention.

At the request of defendants the court conducted a voir dire regarding the admissibility of the challenged evidence. Trooper Douglas D. Sinopoli of the New Jersey State Police testified that on 30 August 1973, while on patrol on the New Jersey Turnpike, he observed an automobile being driven in a reckless and careless manner. He stopped the vehicle by reason of this violation. Defendant Foster was driving the car and defendant Smith was seated in the front right passenger's seat. Trooper Sinopoli glanced through the window on the driver's side of the vehicle and "immediately observed the butt of a weapon under the center arm rest. . . . The white-handle of what I believed to be a weapon . . . under the arm rest." The officer then asked both defendants to step out of the vehicle. They complied with his request and, at the officer's direction, stood in front of their car. Frisking defendants and finding no weapons, the officer ordered them to remain standing in front of their vehicle. He then returned to the car, reached inside, lifted the front center arm rest, and seized a fully loaded .32 caliber pistol. The officer testified: "When I found the revolver I placed both subjects under arrest and advised them of their rights and asked if either had a permit to carry the weapon. Both denied knowledge of the weapon and I arrested both of them." On cross-examination Officer Sinopoli said: "I arrested them for carrying a concealed weapon without a permit, sir. I charged them under the careless driving statute. I also charged them with a narcotics charge. These cases are still pending."

Defendants offered no evidence on the voir dire hearing.

The trial court made findings of fact substantially in accord with the officer's testimony and, on the basis of those findings, concluded as a matter of law that the revolver was admissible in evidence as the product of a proper search of defendants' vehicle "incidental to the arrest of defendant Foster for reckless driving." Defendants' objections and exceptions which form the basis of this assignment question the propriety of this ruling.

We find it unnecessary to determine whether the facts and circumstances of this case warrant the legal conclusion that State's Exhibit 3 was admissible as the fruit of a proper search *incident to a valid arrest.* Pertinent to that question, which we do not reach, see *United States v. Robinson,* 414 U.S. 218, 38 L.Ed. 2d 427, 94 S.Ct. 467 (1973); *Adams v. Williams,* 407 U.S. 143, 32 L.Ed. 2d 612, 92 S.Ct. 1921 (1972); *Coolidge v. New Hampshire,* 403 U.S. 443, 29 L.Ed. 2d 564, 91 S.Ct. 2022 (1971); *Chambers v. Maroney,* 399 U.S. 42, 26 L.Ed. 2d 419, 90 S.Ct. 1975 (1970); *Chimel v. California,* 395 U.S. 752, 23 L.Ed. 2d 685, 89 S.Ct. 2034 (1969); *Preston v. United States,* 376 U.S. 364, 11 L.Ed. 2d 777, 84 S.Ct. 881 (1964); *Carroll v. United States,* 267 U.S. 132, 69 L.Ed. 543, 45 S.Ct. 280 (1925); *State v. Roberts,* 276 N.C. 98, 171 S.E. 2d 440 (1970); *State v. Shedd,* 274 N.C. 95, 161 S.E. 2d 477 (1968). *See generally* Comment, "Warrantless Searches and Seizures of Automobiles and the Supreme Court from *Carroll* to *Cardwell:* Inconsistently through the Seamless Web," 53 N.C. L. Rev. 722, 747-53 (1975).

For the reasons which follow, we hold that the .32 caliber Burgo revolver, State's Exhibit 3, was properly admissible in evidence as the fruit of a lawful warrantless "plain view" seizure under circumstances requiring no search.

[3] The Fourth Amendment does not prohibit all searches and seizures but only those which are unreasonable. *Carroll v. United States, supra; Elkins v. United States,* 364 U.S. 206, 4 L.Ed. 2d 1669, 80 S.Ct. 1437 (1960). This constitutional prohibition, however, does not prevent the seizure of contraband material, dangerous instrumentalities, or evidence of crime when they are readily visible and require no search to discover them. *Coolidge v. New Hampshire, supra; Harris v. United States,* 390 U.S. 234, 19 L.Ed. 2d 1067, 88 S.Ct. 992 (1968); *State v. Crews,* 286 N.C. 41, 209 S.E. 2d 462 (1974); *State v. Allen,* 282 N.C. 503, 194 S.E. 2d 9 (1973); *State v. Hill,* 278 N.C.

State v. Smith

365, 180 S.E. 2d 21 (1971); *State v. McCloud*, 276 N.C. 518, 173 S.E. 2d 753 (1970); *State v. Craddock*, 272 N.C. 160, 158 S.E. 2d 25 (1967); *State v. Bell*, 270 N.C. 25, 153 S.E. 2d 741 (1967). Thus where, as here, the circumstances require no search the constitutional immunity never arises. The guarantee against unreasonable searches and seizures does not prohibit a warrantless seizure where the contraband subject matter is fully disclosed and open to the eye and hand. *State v. Colson*, 274 N.C. 295, 163 S.E. 2d 376 (1968), *cert. denied*, 393 U.S. 1087, 21 L.Ed. 2d 780, 89 S.Ct. 876 (1969); *State v. Kinley*, 270 N.C. 296, 154 S.E. 2d 95 (1967); *State v. Coffey*, 255 N.C. 293, 121 S.E. 2d 736 (1961); *State v. Giles*, 254 N.C. 499, 119 S.E. 2d 394 (1961).

[4] The "plain view" exception to the search warrant requirement was applied in a factual context strikingly similar to the facts in this case in *State v. Dobbins*, 277 N.C. 484, 178 S.E. 2d 449 (1971), where officers, after stopping defendant's vehicle to investigate a possible curfew violation, saw through the car window about two inches of what appeared to be the butt of a shotgun protruding from beneath some papers on the floor of the back seat and thereupon seized the weapon. See also *United States v. Johnson*, 506 F. 2d 674 (8th Cir. 1974), *cert. denied*, _____ U.S. _____, 43 L.Ed. 2d 784, 95 S.Ct. 1579 (1975), in which the plain view doctrine was applied to sustain seizure of a shotgun, the butt of which was observed wedged between back and cushions of rear seat of an automobile stopped for a traffic violation; *United States v. Rollerson*, 491 F. 2d 1209 (5th Cir. 1974), where officers who had stopped defendant's auto seized a rifle, barrel of which was seen protruding from underneath defendant's seat when flashlight was shined into car; *Nunez v. United States*, 370 F. 2d 538 (5th Cir. 1967), where weapon was held properly seized by officers who approached vehicle after it was stopped and saw weapon partially protruding from underneath front seat. The plain view doctrine is firmly established and consistently supported by both state and federal courts. Defendants' constitutional challenge to the admissibility of State's Exhibit 3 is overruled.

This brings us to the question whether the trial court committed prejudicial error in allowing the State to impeach two of its own witnesses. Various exceptions and assignments of error embodied in this question concern the testimony of James Thomas and Robert Davis, witnesses for the State. Defendants

argue that the prosecution was permitted to impeach these witnesses by a series of leading questions relating to their testimony at a previous trial of this case, by certain pretrial conversations between the witness Thomas and the district attorney, and by signed statements given to the police during investigation of the case in November 1973 and January 1974.

With respect to the witness James Thomas, the record reveals that he was serving time for an unrelated crime, had testified for the State at the first trial, and apparently had cooperated with the prosecution in preparation for the second trial until the day he was scheduled to testify. At that time Thomas informed the district attorney that he wanted his prison sentence reduced in exchange for his testimony. When the district attorney informed Thomas that he could only write a letter to the Department of Corrections, Thomas apparently became uncooperative. Nevertheless, the district attorney called Thomas as a witness for the State. When he began testifying contrary to the evidence he had given at the first trial, the district attorney, in the absence of the jury, informed the court of Thomas's prior proposition to barter his testimony for a reduction in his prison sentence and requested that Thomas be declared a hostile witness and that the prosecution be permitted to ask leading questions and to cross-examine him. Although the record is unclear, the court apparently found Thomas to be a hostile witness and authorized the district attorney to lead and to cross-examine him. The jury returned to the courtroom and the following exchange occurred:

[By Mr. Gilchrist, Assistant District Attorney:]

"Directing your attention to the month of July, 1973, did you have an occasion to go to the Days Inn Motel on Tuckaseegee Road?

MR. SHUSTER [defense attorney] : OBJECTION.

THE COURT: OVERRULED.

DEFENDANT FOSTER'S EXCEPTION NO. 28.

A. Yes. I went to the Days Inn Motel on Tuckaseegee Road with Smith and Foster. No one else was with me at that time. We went in Foster's car, a '71 black Oldsmobile. I don't remember our purpose in going to the Days Inn Motel on Tuckaseegee Road at that time.

*   *   *   *

Q. Now, I'll ask you whether or not you have previously testified under oath that you went to the Days Inn Motel on Tuckaseegee during the month of July, 1973 with Smith, Foster, and Harris for the purpose of checking out the motel for a possible robbery?

ALL DEFENDANTS OBJECTED. OVERRULED.

DEFENDANT SMITH'S EXCEPTION NO. 28.

DEFENDANT FOSTER'S EXCEPTION NO. 30.

A. I don't remember.

*   *   *   *

Q. State whether or not you testified that Foster told Harris in your presence that they could go in and get a room and check the traffic in and out of the office, see how many people were coming in and out?

ALL DEFENDANTS OBJECT. OVERRULED.

DEFENDANT SMITH'S EXCEPTION NO. 33.

DEFENDANT FOSTER'S EXCEPTION NO. 34.

A. I don't remember.

Q. State whether or not during that conversation Harris said, 'We will go in and we will kill them all if we have to so that there won't be any witnesses?'

ALL DEFENDANTS OBJECT.

THE COURT: Are you asking him if he testified to that?

Q. State whether or not you testified to that effect?

A. I don't remember.

OVERRULED.

DEFENDANT SMITH'S EXCEPTION NO. 34.

DEFENDANT FOSTER'S EXCEPTION NO. 35.

*   *   *   *

Q. I'll ask you whether or not on a previous occasion you have testified under oath that approximately a month before August 10, 1973, at a meeting at the Days Inn Motel

on Tuckaseegee between yourself, David Benjamin Smith and Bobby Foster and Henry Lee Harris, you testified that the defendant Bobby Foster told you, 'I know a good place we can rob'?

ALL DEFENDANTS OBJECT. OVERRULED.

DEFENDANT SMITH'S EXCEPTION NO. 36.

DEFENDANT FOSTER'S EXCEPTION NO. 37.

A. After you read it to me, yes, sir, I remembered it.

Q. I'll ask you whether at that same meeting, the defendant Benny Smith said, 'Let's go check it out'?

MR. SHUSTER: OBJECTION. OVERRULED.

DEFENDANT FOSTER'S EXCEPTION NO. 38.

A. Yes, you read that too.

THE COURT: He is asking you if you testified to that?

A. I don't remember.

Q. I'll ask you whether or not you testified the defendant Henry Harris said, 'Let's go in'?

ALL DEFENDANTS OBJECT.

DEFENDANT SMITH'S EXCEPTION NO. 37.

DEFENDANT FOSTER'S EXCEPTION NO. 39.

A. I don't remember.

Q. I'll ask you whether or not you testified that the defendant Foster said, 'We'll kill them all so there will be no witnesses'?

ALL DEFENDANTS OBJECT. OVERRULED.

DEFENDANT SMITH'S EXCEPTION NO. 38.

DEFENDANT FOSTER'S EXCEPTION NO. 40.

A. I don't remember.

Q. I'll ask you whether or not you testified that you would participate in the robbery?

A. I don't remember.

* * * *

Q. I'll ask you whether or not you stated under oath that approximately a week after your first trip to the Days Inn Motel in July of 1973, that you returned to the Days Inn Motel with Bobby Foster and Benny Smith?

MR. BLUM [defense attorney] : OBJECTION. OVERRULED.

DEFENDANT SMITH'S EXCEPTION NO. 40.

A. I don't remember.

Q. I'll ask you whether or not you testified under oath that at the second time you returned to the Days Inn Motel on Tuckaseegee that you returned in Bobby Foster's black 1971 Oldsmobile?

A. I don't remember.

Q. I'll ask you whether or not the second time you returned to the Days Inn Motel on Tuckaseegee Bobby Foster told you, 'It doesn't look too hard'?

ALL DEFENDANTS OBJECT. OVERRULED.

DEFENDANT SMITH'S EXCEPTION NO. 41.

DEFENDANT FOSTER'S EXCEPTION NO. 42.

A. I don't remember.

* * * *

Q. I'll ask you whether or not you testified under oath on a previous occasion that the defendant Henry Lee Smith (sic) told you that they were going to do that job at the motel tonight?

BOTH DEFENDANTS OBJECT. OVERRULED.

DEFENDANT SMITH'S EXCEPTION NO. 42.

DEFENDANT FOSTER'S EXCEPTION NO. 45.

A. I don't remember.

Q. I'll ask you whether or not you saw Bobby Foster and Benny Smith on the night of August 10th at Howard's Grill on North Brevard Street?

A. I don't remember.

Q. I'll ask you whether or not you previously testified under oath that on the night of August 10th, 1973, you saw Bobby Smith, excuse me, Bobby Foster, Benny Smith and Henry Lee Harris, all three, at Howard's Grill on the night of August 10th?

MR. SHUSTER: OBJECTION. Been over that. OVERRULED.

DEFENDANT FOSTER'S EXCEPTION NO. 46.

A. I don't remember.

Q. I'll ask you whether you saw Bobby Foster, Benny Smith and Henry Lee Harris in the early morning hours at the home of Henry Harris at approximately dawn on the morning of August 11, 1973?

MR. SHUSTER: OBJECTION. OVERRULED.

DEFENDANT FOSTER'S EXCEPTION NO. 47.

A. I don't remember.

Q. I'll ask you whether or not you previously testified under oath that on the morning of August 11th, at approximately dawn that you did in fact see Henry Lee Harris, Bobby Foster, and Benny Smith at the home of Henry Lee Harris?

ALL DEFENDANTS OBJECT. OVERRULED.

DEFENDANT SMITH'S EXCEPTION NO. 43.

DEFENDANT FOSTER'S EXCEPTION NO. 48.

A. I don't remember."

[5] Although not without criticism, it remains the rule *in criminal cases* in North Carolina that the district attorney may not impeach a State's witness by evidence that his character is bad or that he has made prior statements inconsistent with or contradictory to his testimony. *State v. Pope*, 287 N.C. 505, 215 S.E. 2d 139 (1975) ; *State v. Anderson*, 283 N.C. 218, 195 S.E. 2d 561 (1973) ; *State v. Tilley*, 239 N.C. 245, 79 S.E. 2d 473 (1954). *See* 1 Stansbury's North Carolina Evidence § 40 (Brandis rev. 1973). However, the trial judge in his discretion may allow the prosecutor to cross-examine a hostile or unwilling witness for the purpose of refreshing his recollection or awakening his conscience, thus enabling him to testify cor-

rectly. "In so doing, the trial judge may permit the party to call the attention of the witness directly to statements made by the witness on other occasions. *S. v. Noland* [204 N.C. 329, 168 S.E. 413 (1933)] ; *S. v. Taylor* [88 N.C. 694 (1883)]. But the trial judge offends the rule that a witness may not be impeached by the party calling him and so commits error if he allows a party to cross-examine his own witness solely for the purpose of proving him to be unworthy of belief." *State v. Tilley, supra; accord, State v. Pope, supra; State v. Anderson, supra. See also* McCormick on Evidence § 38 (1972).

[6] In this case it is quite apparent that the district attorney, by his "leading questions" and "cross-examination," was seeking to demonstrate to the jury that the witness Thomas was lying when he stated he "could not remember" having testified at the first trial to certain events and conversations incriminating these defendants. The inescapable conclusion to be drawn from the record is that the State was seeking not only to impeach the credibility of its own witness but was also attempting to force the witness to give the jury the same account of events he had given at the first trial. Failing this, the prosecutor intended to accomplish his efforts at impeachment by placing the previous testimony of this witness before the jury. *See State v. Anderson, supra.*

"A question asked and unanswered is not evidence of any fact. Likewise, a question in which counsel assumes or insinuates a fact not in evidence, and which receives a negative answer, is not evidence of any kind." *State v. Anderson, supra; accord, State v. Trimble,* 327 Mo. 773, 39 S.W. 2d 372 (1931). The able trial judge, obviously aware of this rule, stated that he intended to instruct the jury to that effect. The point evidently was "lost in the shuffle," however, for no such instruction was given and the jury "cannot be counted on to understand this." *State v. Anderson, supra.*

[7] During the examination of James Thomas, the district attorney questioned him with reference to a paper writing marked State's Exhibit 10 which purportedly was a statement made by Thomas to a police officer in November 1973. This statement apparently consisted of responses to the identical questions which were being asked at trial regarding the involvement of defendants in the crimes charged in this case. Defendants objected to the interrogation of Thomas concerning his previous written statement and, with the jury absent, argued

that such examination was tantamount to the State's impeachment of its own witness. In overruling the objections the court replied that the statement previously made by Thomas was "no more impeaching than the leading questions that he has been permitted to ask." That is precisely the point defendants now urge, and we think the point is well taken.

The district attorney's "leading questions" were calculated not only to impeach his own witness but also to prove the contents and the truth of the prior inconsistent testimony of the witness at the first trial. The obvious effect of these questions was to demonstrate to the jury that a written record existed which corroborated verbatim the "testimony" contained in the district attorney's questions. The anti-impeachment rule makes Exhibit 10 incompetent as evidence, and the district attorney's questions which indirectly but unmistakably placed it before the jury were prejudicial. Such interrogation of the witness Thomas violated the "rule of law which forbids a prosecuting attorney to place before the jury by argument, insinuating questions, or other means, incompetent and prejudicial matters not legally admissible in evidence." *State v. Phillips,* 240 N.C. 516, 82 S.E. 2d 762 (1954) ; *accord, State v. Anderson, supra.*

[8]   Nothing in *State v. Pope,* 287 N.C. 505, 215 S.E. 2d 139 (1975), relied on by the State, requires a different result. In that case we recognized for the first time an exception to the anti-impeachment rule which "allows impeachment 'where the party calling the witness has been misled and surprised or entrapped to his prejudice.' [Citations omitted.]" *State v. Pope, supra,* at 512. *Pope* points out that surprise does not mean mere disappointment but means *taken unawares.* "Where the prosecuting attorney knows at the time the witness is called that he has retracted or disavowed his statement, or has reason to believe that he will do so if called upon to testify, he will not be permitted to impeach the witness. He must first show that he has been genuinely 'surprised or taken unawares' by testimony which differed in material aspects from the witness' prior statement, which he had no reason to assume the witness would repudiate." *State v. Pope, supra,* at 514.

In the instant case there can be no doubt that, *sometime prior to calling the witness Thomas,* the district attorney had substantial reason to believe that Thomas would repudiate or disavow his prior testimony if called upon to testify. This being so, the prosecutor could not have been genuinely surprised or

taken unawares by the testimony of Thomas. To the contrary, he had every reason to believe that Thomas would retract his previous testimony or feign a loss of memory. Under these circumstances, the district attorney should have marked Thomas off the list of the State's witnesses. *State v. Anderson, supra.*

Robert Davis was called as a witness for the State and examined in a fashion substantially similar to the examination of the witness James Thomas. However, if Davis, *prior to taking the stand,* ever evinced any reluctance to testify for the State, or ever became uncooperative, or otherwise placed the district attorney on notice that he had suffered a loss of memory or had decided to disassociate himself from the prosecution of these defendants, the record fails to show it. Thus the district attorney may or may not have been surprised or taken unawares so as to entitle him, with the permission of the court, to impeach Davis. *See State v. Pope,* 287 N.C. 505, 215 S.E. 2d 139 (1975). We therefore omit the district attorney's examination of Davis and base our decision on what transpired during the examination of James Thomas.

The trial court erred in allowing the district attorney to impeach his own witness and, in so doing, to place before the jury incompetent and prejudicial matters not legally admissible in evidence. This error requires a new trial. Remaining assignments need not be discussed since they are unlikely to recur upon retrial.

New trial.