STATE OF NORTH CAROLINA v. JOHN HENRY ANDERSON

No. 33

(Filed 11 April 1973)

1. Criminal Law § 90— rule that party may not impeach his own witness

The solicitor is precluded from discrediting a State's witness by evidence that his general character is bad or that the witness has made prior statements inconsistent with or contradictory of his testimony; however, the trial judge has the discretion to permit the solicitor to cross-examine either a hostile or an unwilling witness for the purpose of refreshing his recollection and enabling him to testify correctly, but the trial judge offends the rule that a witness may not be impeached by the party calling him and so commits error if he allows a party to cross-examine his own witness solely for the purpose of proving him to be unworthy of belief.

2. Criminal Law §§ 90, 102— State's witness — impeachment by solicitor — improper questioning

The solicitor's questioning of a State's witness with reference to a statement given by her to officers at the time of the homicide, but repudiated by her before trial violated the rule of law which forbids a prosecuting attorney to place before the jury by argument, insinuating questions, or other means, incompetent and prejudicial matters not legally admissible in evidence.

3. Criminal Law § 90— rule that party may not impeach his own witness — inadmissibility of prior inconsistent statements

The rule that the State could not impeach its own witness by showing that she had made prior statements contradictory of her

testimony at the trial made a statement given by her to officers immediately after the homicide in question incompetent as evidence; therefore, it was improper for the solicitor to ask the witness questions which clearly suggested the existence and text of such prior inconsistent statements.

4. **Criminal Law § 90— rule that party may not impeach his own witness — questions with respect to prior inconsistent statement — prejudicial error**

    Where a State's witness repudiated before trial a statement made by her to officers immediately after the homicide in question, the trial judge erred in allowing the solicitor to cross-examine the witness before the jury with respect to the existence and contents of the statement, and such prejudicial error required that the verdict and judgment be vacated and a new trial be ordered.

APPEAL by defendant from *Brewer, J.,* 11 September 1972 Criminal Session of CUMBERLAND.

Defendant was tried upon an indictment which charged him with the murder of William Junior Archie on 17 June 1972.

The State's evidence tended to show:

The deceased, Archie, roomed at the home of Mrs. Dora Campbell, who lived at 416 Chase Street in Fayetteville. Defendant lived across the street in the home of Mrs. Campbell's sister, Daisy McCleary. Ordinarily the two men were the best of friends. On the evening of 16 June 1972 they had been drinking beer. At the Red Rooster Lounge they got into an argument over a pistol and, about 9:00 p.m., the manager ordered them outside. Later, however, Archie returned alone and remained until 1:00 a.m., when he left with a pistol stuck under his belt.

About 1:38 a.m. on 17 June 1972, in response to a call, Police Officer L. D. McNair went to the home of Dora Campbell. He was the first to arrive but officers John B. Wemys and Alfred Post soon joined him. In the street outside McNair saw defendant and Mrs. Campbell's son, Bubba. Archie's dead body was lying just inside the door; the feet were forward; the head inside the door of the bedroom immediately to the right of the front room. On the left side of the head there was a big hole. In the upper part of the screen door and above the front door were "a lot of small pellet holes."

Observing the presence of Dora Campbell, Officer McNair asked her the name of the dead man and who had shot him.

McNair testified, without objection, that Mrs. Campbell told him John Henry Anderson had shot Archie and then added, "The s.o.b. is out there; go get him." She was "cursing and hollering real loud about Mr. Anderson." She had been drinking but was not intoxicated. McNair went out into the street and asked Bubba, whom he knew, "Who was John Anderson?" Bubba did not answer, but defendant did. Before the officers had directed any questions whatever to him, defendant told them that he was Anderson; that he had shot Archie; and that the gun (a 410-gauge shotgun) was leaning against the McCleary house across the street.

On the basis of defendant's statement McNair arrested him and removed from his pockets one loaded and one spent 410-gauge shotgun shell.

When Officer Wemys arrived at the scene he saw defendant in a group of people in the street. As he approached the group he heard a woman say that defendant had shot Archie twice and heard defendant reply that he had shot only once.

As soon as defendant was arrested and placed in the patrol car, Officer McNair gave him the Miranda warning. Thereafter defendant told McNair that Archie had cut him earlier in the evening and that he shot Archie after returning from the hospital. Defendant said nothing to the officers with reference to self-defense nor did he say deceased had a pistol. Officer Post took Mrs. Campbell to the police department where a statement was obtained from her.

Defendant's death, in the opinion of the pathologist who performed an autopsy, was the result of a shotgun blast which caused massive injury to the entire brain system. The base of the skull "was virtually absent due to the injury." There were multiple fractures of the skull over the left side of the head and the wadding of a shotgun shell along with several lead shots was within the brain.

Before calling Dora Campbell as a witness, in the absence of the jury, the solicitor asked the court to hear evidence and to declare Mrs. Campbell "a hostile witness and allow the State to examine her." On *voir dire*, Mrs. Campbell testified that she was 65 years old; that she had not been drinking on the night of 16 June 1972; that she had retired early and had slept until she was awakened by a gunshot right at her outside door; that

State v. Anderson

she "was frightened sick" and recalls nothing further; that she does not remember talking to Officers McNair, Wemys or Post, and she did not remember giving the police a signed statement with reference to the shooting.

The solicitor then (still in the absence of the jury) offered the testimony of Officers Alfred Post, L. D. McNair, and John B. Wemys, which tended to show that when they arrived at Mrs. Campbell's home she was cursing defendant "for everything she could lay her mouth to about killing her man Archie"; that she had been drinking; that she accompanied the officers to the police station and there made a statement (State's Exhibit 2) which was transcribed and signed by her about 3:30 a.m. In brief summary, in the statement, Mrs. Campbell said that she was awakened by a knock on the door and told Archie, who was lying on the couch in her bedroom, to answer the door; that he did so and she heard a gun fire twice; that Archie fell back and defendant entered her room, stepped over Archie's body and said that if Archie was not dead he would kill him; that defendant then left, saying that he was going to call the law because he knew they would get him.

The court found Dora Campbell to be a hostile witness and granted the solicitor permission "to ask her leading questions" relative to Archie's death.

The jury returned and, in response to the solicitor's questions, Mrs. Campbell testified that she did not recall telling the officer defendant shot Archie and she did not recall seeing or speaking to any particular police officer on the morning of 17 June 1972. She did recall going to the police station and being questioned but remembers nothing she said. The solicitor then showed her State's Exhibit 2. In answer to his questions she said she did not say any part of what was on that paper and if her mark was on it "somebody must have held [her] hand and made [her] mark it." The solicitor then proceeded to ask Mrs. Campbell, with specific reference to each sentence in Exhibit 2, if she made that particular statement.

The following questions, and Mrs. Campbell's answers thereto, typify the solicitor's "leading questions":

"Q. I ask you if you did not, in fact, tell Officer Post and Officer Brissom that you were asleep in your room and that you

heard a knock on the door and William Archie was on a cot in the bedroom you were in?

"A. No, sir.

"Q. Do you recall telling Officers Brissom and Post that you told William Archie that someone was at the door?

"A. No, I never did tell him nothing.

"Q. Do you recall telling the officers that Archie got up and walked to the door and that you heard a gunshot blast?

"A. No, sir.

"Q. Do you recall telling the officers that Archie fell backwards and that you got up and walked to the door and saw Archie lying there with blood on his face?

"A. No, sir.

"Q. Do you remember telling the officers that John Henry Anderson came in the house with a shotgun and said that if he was not dead he would kill him?

"A. I don't remember saying that.

"Q. Do you recall telling the officers that at that point Anderson stepped over the body and then said, 'If he isn't dead, I will kill him?'

"A. I don't recall that."

As a witness for defendant, Daisy McCleary testified, in substance, as follows:

About 10:30 on the night he was shot, Archie came to the McCleary house and asked for defendant. When Daisy McCleary told him defendant was not there he said he was going to stay there until defendant came home. In reply to her question whether he had cut defendant, Archie said, "I definitely did, and the so-and-so needed a cutting a long time. I give it to him, I knocked John down." Daisy McCleary then tried to get Archie to let her keep his pistol for him until the next day "when he would feel better." Archie declined, saying, "I definitely will not give it to you. I will give it to John and the way I give it to him, he won't like." Archie then stuck the pistol back in his belt and staggered across the street about 12:30 a.m. Daisy McCleary waited for defendant so that she

State v. Anderson

could warn him. When he came home about twenty-five minutes after Archie had left he asked her if she had seen Archie. Defendant then went into the house and came back out and she heard a gun fire. She "didn't tell John anything when he left because [she] was afraid to tell him that Archie had a gun for him."

Defendant's own testimony tended to show:

On 17 June 1973, Archie owed defendant around $140.00 and he was wearing defendant's shoes. At the Red Rooster Lounge the two were arguing about money and, after they were put out, Archie grabbed defendant, hit him "upside the head" and threw him down. Defendant's jaw was bruised and his mouth cut. A fight ensued and Archie cut defendant on the arm with a razor. A girl took defendant to the hospital where he was "sewed up and charged $29.50." After defendant got home he had no money and thought he would try to get some from Mrs. Campbell by pawning a shotgun. Considerably after midnight he walked across the street and knocked on the door which opened into "Miss Dora's bedroom." Someone, whom he did not see, opened the door and he observed Miss Dora sitting on the side of her bed. He also saw Bubba in the house. As he started toward Miss Dora's bed, Archie jumped up and snatched his .22 pistol from his belt. Defendant shot him and Archie fell back toward the other door. Defendant "really don't know if Archie fired a shot but he did point the gun at [him]." After defendant called the police, "several more people went into the house and came back and said they didn't find any gun."

Defendant did not know Archie was at Miss Dora's when he went there; he did not go over there to kill him. He was not mad at Archie; they were good friends and he feels like they would have made up later on. He did not say a word to Archie, and Archie said nothing to him before he fired the gun. He didn't tell the police he shot in self-defense because they did not ask him, and he did not care to make a statement without a lawyer. Defendant has previously been convicted "of misdemeanor, assault with a deadly weapon, and then larceny and all the rest were misdemeanors except one; that was manslaughter back in 1964."

The State did not ask for the death penalty and the jury found defendant "guilty of murder in the first degree with a recommendation of life imprisonment." From the judgment that

he be imprisoned for the term of his natural life, defendant appealed.

*Attorney General Morgan; Associate Attorney Haskell for the State.*

*Donald W. Grimes, Assistant Public Defender for defendant appellant.*

SHARP, Justice.

Defendant states the one question he seeks to raise on the appeal as follows: "Did the court err in its finding that the witness for the State Dora Campbell was a hostile witness and in permitting the Solicitor for the State to cross-examine the witness relative to the shooting of the deceased William Archie on the night of 17 June 1972?"

The foregoing question is based upon defendant's assignment of error and exception No. 4, which challenge the court's ruling which declared Dora Campbell "a hostile witness" and allowed the solicitor "to ask her *leading questions* relative to . . . the killing of the deceased, William Archie, on the night of June 17, 1972" at her home.

Defendant's contentions are that the solicitor's "leading questions" constituted cross-examination of Mrs. Campbell, a State's witness, for the purpose of discrediting her statement that she knew nothing about the actual killing of Archie; that the production of Exhibit 2 before the jury, and the solicitor's seriatim questions with reference to it, were highly prejudicial because the questions implied that Mrs. Campbell had previously answered them orally and in writing in a manner tending to support the charge of murder in the first degree.

[1] Until changed by statute applicable to civil cases (G.S. 1A-1, Rule 43(b) (1969)), it was established law in this State that a party could not impeach his own witness in either a civil or a criminal case. 1 Stansbury, *North Carolina Evidence* § 40 (Brandis rev. 1973). *See also* McCormick, *Evidence* § 38 (Cleary Ed., 2d ed. 1972); 3A Wigmore, *Evidence* §§ 896-905 (Chadbourn rev. 1970). This rule, unchanged as to criminal cases, still precludes the solicitor from discrediting a State's witness by evidence that his general character is bad or that the witness had made prior statements inconsistent with or contradictory of his testimony. However, the trial judge has the discretion to

permit the solicitor to cross-examine either a hostile or an unwilling witness for the purpose of refreshing his recollection and enabling him to testify correctly. "In so doing, the trial judge may permit the party to call the attention of the witness directly to statements made by the witness on other occasions. *S. v. Noland,* [204 N.C. 329, 168 S.E. 413 (1933)]; *S. v. Taylor,* [88 N.C. 694 (1883)]. But the trial judge offends the rule that a witness may not be impeached by the party calling him and so commits error if he allows a party to cross-examine his own witness solely for the purpose of proving him to be unworthy of belief." *State v. Tilley,* 239 N.C. 245, 251, 79 S.E. 2d 473, 477-78 (1954).

In this case it is quite clear that the solicitor, by his "leading questions," was not only undertaking to prove Mrs. Campbell testified falsely when she said she did not make the statements contained in Exhibit 2 and all she knew about the homicide was that she heard a shotgun blast. He was also attempting to induce her to give the jury the same account of events she had given the police immediately after Archie was killed. Failing in this, he wanted to indicate to the jury what she had told the investigating officers at that time.

We note that this case does not present a situation in which the solicitor was surprised by a witness whose testimony in court was contrary to what he had a right to expect. In such an event the court may permit a party to cross-examine his own witness "as to what he had stated in regard to the matter on former occasions, either in court or otherwise, and thus refresh the memory of the witness and give him full opportunity to set the matter right, if he will, and at all events to set [the party] right before the jury. But you cannot do this for the mere purpose of discrediting the witness; nor can you be allowed to prove the contradictory statements of the witness on other occasions, but must be restricted to proving the facts by other evidence." *State v. Taylor, supra* at 697-98.

When the solicitor called Mrs. Campbell to testify before the jury he was well aware that she had either suffered a loss of memory or had decided to disassociate herself entirely from the State's prosecution of defendant. That same day, only a very short time before, he had tried without success to "awaken her conscience" on *voir dire*. At that time, in the absence of the jury, he had asked her the same questions he asked her in the pres-

State v. Anderson

ence of the jury, and he received the same answers. His request for the *voir dire* prior to calling Mrs. Campbell as a witness before the jury makes it obvious that, before the trial, he had learned that she had repudiated Exhibit 2.

A question asked and unanswered is not evidence of any fact. Likewise, a question in which counsel assumes or insinuates a fact not in evidence, and which receives a negative answer, is not evidence of any kind. *State v. Trimble,* 327 Mo. 773, 39 S.W. 2d 372 (1931). The jury, however, cannot be counted on to understand this.

[2, 3] The solicitor's questioning of Mrs. Campbell with reference to Exhibit 2 violated the "rule of law which forbids a prosecuting attorney to place before the jury by argument, insinuating questions, or other means, incompetent and prejudicial matters not legally admissible in evidence." *State v. Phillips,* 240 N.C. 516, 527, 82 S.E. 2d 762, 770 (1954). *See State v. Wyatt,* 254 N.C. 220, 222, 118 S.E. 2d 420, 421 (1961). The rule that the State could not impeach its own witness, Mrs. Campbell, by showing that she had made prior statements contradictory of her testimony at the trial made Exhibit 2 incompetent as evidence. It was therefore improper for the solicitor to ask her questions which clearly suggested the existence and text of such prior inconsistent statements.

[4] Defendant was tried for first-degree murder and convicted of it. His defense was self-defense. No eyewitness to the homicide testified for the State. Obviously Mrs. Campbell's statement in Exhibit 2 that, after she heard a shotgun blast, defendant came into her house, stepped over Archie's dead body and said, "If he isn't dead, I will kill him," was highly prejudicial to defendant. After Mrs. Campbell had testified and been cross-examined upon *voir dire* her repudiation of the statement she had made to the officers had been definitely established. The solicitor should have then "marked her off" of the list of State witnesses, and the trial judge erred in permitting him to cross-examine her again before the jury. This error requires that the verdict and judgment be vacated, and a new trial ordered.

New trial.