STATE OF NORTH CAROLINA v. ALVIN DEXTER LOVETTE

No. 14

(Filed 1 April 1980)

**1. Criminal Law § 90— witness's pretrial statement repudiated—prosecution not surprised—impeachment of witness improper**

Where a State's witness made a pretrial statement to investigating officers concerning statements made by defendant to him and concerning state-

ments made in his presence by and between defendant and witnesses to an altercation between defendant and the victim, but three weeks later the witness informed investigating officers and the district attorney that he did not want to testify because he did not want to be responsible for people being imprisoned, the prosecuting attorney was not genuinely surprised or taken unawares by the witness's repudiation of his pretrial statement, and the trial court erred in permitting the prosecuting attorney to impeach his own witness; even if the prosecution was genuinely surprised, the witness's testimony as to what the eyewitnesses said to defendant would still be incompetent on the issue of defendant's guilt or innocence, since testimony tending to show the witness's prior inconsistent statement was admissible only to show that the State was surprised by his testimony and to explain why the witness was called, and such testimony was not to be used as substantive evidence for any purpose.

2. **Homicide § 20— stick near deceased's body—admissibility**

   The trial court in a homicide prosecution did not err in admitting into evidence a stick found in a creek near deceased's body, since various State witnesses testified that it "looked about like" the stick defendant had in his hand when the victim was first assaulted.

DEFENDANT appeals from judgments of *Davis, J.,* 25 June 1979 Criminal Session, GUILFORD Superior Court.

Defendant was tried upon separate bills of indictment charging him with first degree murder and armed robbery of James Banner Wilson on 28 February 1979. In the murder case, defendant was arraigned on the charge of second degree murder only or lesser included offense as the jury might find. In the robbery case, the district attorney sought a verdict of guilty of attempted armed robbery. Defendant pled not guilty in each case.

The State offered evidence tending to show that on the evening of 28 February 1979 defendant, accompanied by Minnie Morrison and Sharon McDuffie, arrived about 7 p.m. at the home of Dorothy Medley at 508 Wise Street in High Point. Soon thereafter two white men, one of whom was James B. Wilson, came to the house. Wilson sat in a chair and Sharon McDuffie sat on the arm of Wilson's chair. She kept asking him to go home with her and kept trying to "go into his back pockets." At this time defendant and Minnie Morrison were playing cards with other people at a table across the room.

Around 8 p.m. defendant and James B. Wilson left the house accompanied by the two women, Morrison and McDuffie. Mary Medley and Linda Hampton testified they then heard a "bump"

on the front porch like somebody falling, looked out and saw Wilson lying on the porch floor while the two women were stooped over him going through his pockets. Defendant was standing near Wilson's head holding a stick and "kind of" kicked Wilson in the stomach and hit him once on the head with the stick. James Froneyberger, who had been playing cards inside the house, then came out and told defendant he "couldn't do that in this yard." Froneyberger asked Wilson twice about his condition and Wilson said he was all right. Defendant and the two girls were standing across the street and defendant still had the stick in his hand when Wilson arose and walked up Wise Street toward Park Street. Wilson "staggered some but walked pretty good." Defendant and the two girls walked down the street to the "Player's Lounge" where they met Clifford Johnson.

The State's evidence further tends to show that a little after 7 a.m. the next morning Minnie McFayden, who lived on Park Street, two and one-half blocks south of Wise Street, saw Wilson's body beside a rock in a creek that runs just south of her house. Where Park Street crosses the creek there is a bridge without a railing with large rocks under the bridge and along the edge of the creek. A search of the creek from Park Street to where the body was found yielded two black shoes, one upper denture plate, a shirt, a sweater, and a stick (State's Exhibit 3). Wilson's car was found parked near Dorothy Medley's home on Wise Street.

An autopsy revealed many injuries on Wilson's body, including hemorrhages, cuts, bruises, abrasions, seventeen broken ribs, and fractures of four vertebrae in the spine. It was Dr. Morton's opinion that Wilson died of severe blunt trauma.

Defendant Lovette did not testify but offered the testimony of James McFayden and Richard Cox. McFayden said he arrived at the house of Minnie McFayden, the woman who first spotted Wilson's body, at about 7:30 p.m. on the evening of 28 February 1979. When he drove up he saw "two white girls and a white boy" in her yard near the creek and saw the "boys" go down into the creek.

Richard Cox, a self-employed private detective, testified that he made measurements of the area; that it is 235 feet from 508 Wise Street to its intersection with Park Street; that it is 507 feet from that intersection to the creek bed; that it is 152 feet

from the bridge over the creek to where Wilson's body was found; and the height of the bridge over the creek is about ten feet. This witness testified that he went to the evidence room at the High Point Police Department to view all of the physical evidence the State had at that time. He viewed Mr. Wilson's clothing and shoes and was informed that the only other physical evidence available was photographs and a diagram. He was never shown the stick identified as State's Exhibit No. 3.

Additional evidence necessary to understand the various assignments of error will be narrated in the discussion of the assignment to which the evidence relates.

The jury convicted defendant of second degree murder and attempted robbery with a dangerous weapon. He was sentenced to life imprisonment for the murder and not less than twenty nor more than forty years for the attempted armed robbery. He appealed to the Supreme Court in the murder case, and we allowed motion to bypass the Court of Appeals in the robbery case. Both cases are now before this Court for initial appellate review.

*Rufus L. Edmisten, Attorney General, by James E. Magner, Jr., Assistant Attorney General, for the State.*

*Charles L. Cromer, attorney for defendant appellant.*

HUSKINS, Justice.

Defendant contends the trial court erred in allowing the district attorney to impeach the testimony of State's witness Clifford Johnson. This constitutes his first assignment of error.

Clifford Johnson testified he knew defendant Lovette, saw him and talked with him during the nighttime hours of 28 February 1979. However, Johnson claimed that defendant Lovette did not in that conversation discuss with him the incidents that had occurred that night. At this point, the prosecutor, claiming he had been surprised, moved the court to declare Johnson a hostile witness. After a voir dire examination, the court granted the motion and permitted the prosecutor to cross-examine State's witness Clifford Johnson as a hostile witness. This witness had made a pretrial statement to investigating officers Sink and Finch concerning statements made by defendant Lovette to him and concerning statements made in his presence by and between

Sharon McDuffie, Minnie Morrison and defendant. These statements were tape-recorded and transcribed. The prosecutor, over consistent objections timely made, was allowed, in the presence of the jury, to read from Johnson's pretrial statement in formulating his questions and then ask not only about statements made to him by defendant but also about accusatory statements made to defendant by Sharon McDuffie and Minnie Morrison. The following are representative:

"Q. Did Sharon McDuffie ever make any statements to you in front of Alvin Lovette?
A. She mentioned something in front of him.

Q. What did she say to Alvin Lovette in your presence?
A. Well, she just said, 'Lovette you just—you hit the man.' That's all she said.

Q. And when she said, 'Lovette, you hit that man.' What did he say or do?
A. He didn't say nothing."

After additional voir dire the State's examination continued:

"Q. Mr. Johnson, you recall the statement you gave to the police officers on March 12th, 1979; is that correct?
A. Yeah.

Q. Mr. Johnson, didn't you tell Detective Finch that Alvin Lovette told you that Sharon McDuffie hit the man in the head with her shoe? Didn't you tell him that?
A. Yeah.

Q. Didn't you tell him that when Sharon McDuffie confronted Alvin Lovette that she got up into his face and Sharon McDuffie said, 'Duck, you know that ain't the man you saw. You're the one that beat that man up.' She said, 'Ya'll the one that runned him down.' Didn't you tell Detective Sink that that's what Sharon McDuffie said to Alvin Lovette?
A. I ain't said he run him down. I said he beat him up.

Q. In fact, Sharon McDuffie did say that in front of Alvin Lovette, didn't she?
A. Yeah.

Q. And what did Alvin Lovette do when Sharon McDuffie said that?
A. Nothing.

Q. Did he say anything?
A. Nope.

Q. Did you hear Sharon McDuffie say anything else to Alvin Lovette?
A. No.

Q. Isn't it a fact, Mr. Johnson, that you told the police officers that Sharon McDuffie also said, 'Duck, you know — know you hit the man in the head with them shoes.' Said, 'You're the one that beat the man up.'
A. No.

Q. Answer my question. Didn't you tell the police officers that?
A. Yeah. Uh-huh."

\*      \*      \*      \*

"Q. Did Alvin Lovette or anybody — did Sharon McDuffie or Minnie Morrison in Alvin Lovette's presence, did you hear them say anything about having to chase a man down?
A. No.

Q. Didn't you tell the police officers on March 12, 1979, what they said was that they had to chase him? Did you tell the police officers that?
A. I told them that, but they didn't tell me that they chased anybody.

Q. You told the police officers that, didn't you?"

\*      \*      \*      \*

"Q. Now, I believe that you had all three of the people — in your car on the 28th?
A. Yep.

Q. And they made certain statements to you in your car on the 28th, is that correct?
A. They weren't talking to me in my car."

\*      \*      \*      \*

"Q. Isn't it a fact that you told police officers on March 12, 1979, that one of them made the statement that when they started beating him up, the man said, 'I ain't got no money. I gave it to my partner. The other dude got the money.' Didn't you tell the police officers that?

A. Yep."

\*   \*   \*   \*

"Q. Mr. Johnson . . . was it said in Alvin Lovette's presence by Alvin Lovette or Minnie Morrison or Sharon McDuffie about what they did to the man after he told them that he didn't have any money? Do you recall any of them saying that?

A. No.

Q. You didn't tell the police officers on March 12, 1979, in response to the question . . . 'And what did they say they did?' And you said, 'They went on and beat him up.' Didn't you tell the police officers that?

A. I probably did."

Albeit with some criticism, it is the rule in criminal cases in North Carolina that the district attorney may not impeach a State's witness by evidence that his character is bad or that he has made prior statements inconsistent with or contradictory to his testimony. *State v. Pope*, 287 N.C. 505, 215 S.E. 2d 139 (1975); *State v. Anderson*, 283 N.C. 218, 195 S.E. 2d 561 (1973); 1 Stansbury's North Carolina Evidence § 40 (Brandis rev. 1973). Even so, when the State is genuinely surprised, *i.e.*, taken unawares, by its own witnesses, the trial judge in his discretion may allow the prosecutor to cross-examine the hostile or unwilling witness for the purpose of refreshing his recollection or awakening his conscience, thus enabling him to testify correctly. *State v. Smith*, 289 N.C. 143, 221 S.E. 2d 247 (1976); *State v. Pope*, *supra; State v. Anderson*, *supra*. In doing so, the prosecutor may call the attention of the hostile witness directly to prior statements made by the witness which are inconsistent with or contradictory to his "surprise" testimony at trial. *State v. Pope*, *supra; State v. Anderson*, *supra*.

Where a witness treacherously induces the State to call him by representing that he will testify favorable to the State's con-

State v. Lovette

tentions and then surprises the prosecutor with testimony contra, cross-examination is unlikely to refresh his memory or awaken his conscience. In such circumstances, cross-examination of the hostile witness by prior inconsistent statements is permitted in order to allow the State to show that it was induced to call the witness by a previous statement of the witness "'made under such circumstances as to warrant a reasonable belief that the witness would repeat the statement when called to testify.'" *State v. Pope, supra,* quoting 58 Am. Jur., Witnesses, § 799 (1948). However, before granting the prosecutor's motion to treat his witness as hostile or unwilling and to cross-examine him, "the court must be satisfied that the State's attorney has been misled and surprised by the witness, whose testimony as to a material fact is contrary to what the State had a *right* to expect. . . . If the trial judge finds that the State should be allowed to offer prior inconsistent statements, his findings should also specify the extent to which such statements may be offered." *State v. Pope, supra,* 287 N.C. at 513.

We further held in *Pope* that where the prosecuting attorney "knows at the time the witness is called that he has retracted or disavowed his statement, or has reason to believe that he will do so if called upon to testify, he will not be permitted to impeach the witness. He must first show that he has been genuinely 'surprised or taken unawares' by testimony which differed in material respects from the witness's prior statements, which he had no reason to assume the witness would repudiate." 287 N.C. at 514.

[1] Applying the foregoing principles to the case at hand, we hold that the prosecuting attorney was not genuinely surprised or taken unawares. Officer Sink, testifying on voir dire in the absence of the jury, stated that three weeks after Clifford Johnson made his statement on 12 March 1979, he came to the police department and informed Officer Sink that the statement he had given on March 17 was true "but that he did not want to testify due to the fact that it might get the three people some time and he did not want to be responsible for that. . . . He came back the next day, at which time he along with myself and Sergeant Finch had a meeting with the district attorney, Mr. Kimel." At the trial of this case, after four witnesses had been examined, Clifford Johnson was called and took the stand. After giving his name and place of residence, he testified he knew de-

fendant, had a conversation with him on the night of February 28, but said defendant "did not discuss with me the incident that has been discussed here today." At that point the prosecutor said: "At this time the State has a motion to make outside the presence of the jury." The jury was excused and a lengthy voir dire conducted, finally resulting in a finding that Johnson was a hostile witness and the State entitled to cross-examine him based on surprise. It thus appears that prior to calling the witness Johnson, the district attorney had substantial reason to believe that Johnson would likely repudiate his pretrial statement if called upon to testify. The record strongly suggests that the prosecutor could not have been genuinely surprised or taken unawares by the testimony of Johnson. To the contrary, he knew, or had every reason to believe, that Johnson would not testify consistent with his pretrial statement. Under these circumstances the district attorney was not entitled to impeach his own witness and the court erred to defendant's prejudice in permitting him to do so. *See State v. Pope, supra; State v. Anderson, supra.*

But if we assume *arguendo* that the prosecution was genuinely surprised, Johnson's testimony as to what the girls said to defendant would still be incompetent on the issue of defendant's guilt or innocence. Testimony tending to show a witness's prior inconsistent statement "is admitted only to show that the State was surprised by his testimony and to explain why the witness was called. Such statements 'are not probative evidence on the merits and are not to be treated as having any substantive or independent testimonial value.' [Citations omitted.] Their only effect is to impeach the credibility of the witness." *State v. Pope, supra,* 287 N.C. at 514. *Accord,* 1 Stansbury's North Carolina Evidence § 46 (Brandis rev. 1973). Thus, neither the recording nor the typewritten transcript of Johnson's statement could be used against defendant to prove an implied admission or as substantive evidence for any purpose. In fact, neither was offered for any purpose, yet the prosecutor's questions unmistakably placed both before the jury and the jury was permitted to consider the accusatory statements of Minnie Morrison and Sharon McDuffie on the question of defendant's guilt or innocence. In effect, the prosecutor's cross-examination of Johnson was calculated not only to impeach him but also to prove the contents and the truth of his prior inconsistent statement to Officers Sink and Finch on 12

March 1979. This violated the rule which forbids a prosecutor to place before the jury incompetent and prejudicial matters not legally admissible in evidence. *State v. Smith, supra,* 289 N.C. at 158; *State v. Anderson, supra,* 283 N.C. at 226; *State v. Phillips,* 240 N.C. 516, 82 S.E. 2d 762 (1954). In any event, since the prosecutor was not entitled to impeach his own witness on the facts revealed by the record here, the evidence elicited from Johnson by the improper cross-examination was not competent for any purpose. This requires a new trial. Defendant's first and third assignments of error are sustained.

Defendant's second and fourth assignments address insignificant items of evidence, and both are overruled without discussion.

[2] Defendant's fifth and final assignment of error relates to the introduction, over objection, of the stick (State's Exhibit 3) found in the creek near the body of James B. Wilson on the morning of 1 March 1979. Defendant contends the stick was not properly identified and had no relevant connection with this case. He further contends the State concealed its existence when defendant sought to inspect tangible objects in the possession of the State which the State intended to use as evidence at his trial.

Various State's witnesses testified that State's Exhibit 3 "looked about like" the stick defendant had in his hand when the victim was first assaulted on the porch at the home of Dorothy Medley. Dorothy Medley said it "could be the stick."

Under many decisions of this Court, "every circumstance that is calculated to throw any light upon the supposed crime is admissible." *State v. Hamilton,* 264 N.C. 277, 141 S.E. 2d 506 (1965). Articles shown by the evidence to have been used in connection with the crime charged are competent and properly admitted in evidence. *State v. Stroud,* 254 N.C. 765, 119 S.E. 2d 907 (1961). "So far as the North Carolina decisions go, any object which has a relevant connection with the case is admissible in evidence, in both civil and criminal trials. Thus, weapons may be admitted where there is evidence tending to show that they were used in the commission of a crime or in defense against an assault." 1 Stansbury, *supra,* § 118. *See, e.g., State v. Fox,* 277 N.C. 1, 175 S.E. 2d 561 (1970) (a case of murder and robbery in which a pistol which "looked like" the one used in the crime was admitted); *State v. Macklin,* 210 N.C. 496, 187 S.E. 785 (1936) (shotgun found

in defendant's room admitted where there was evidence that it was like one defendant possessed on the night of the shooting). Accordingly, we conclude that State's Exhibit 3 was properly admitted in evidence.

The record does not disclose why the district attorney failed to allow defense counsel to inspect the stick or why he failed to inform defense counsel the State had such an object which it intended to offer into evidence. There being no evidence of bad faith on the part of the State, and considering defendant's failure to indicate surprise and move for alternate sanctions under G.S. 15A-910, we hold that the trial court was within its discretion in overruling defendant's general objection and allowing the stick to be offered in evidence. *State v. Hill,* 294 N.C. 320, 240 S.E. 2d 794 (1978). In any event, since there must be a new trial on other grounds, this assignment no longer has any significance. It is overruled.

Defendant is entitled to a new trial on both charges.

New trial.