STATE OF NORTH CAROLINA v. WILLIAM ECTOR COPE, JR.

No. 127A81

(Filed 9 August 1983)

1. Criminal Law § 90— impeachment of State's witness through use of prior in-
consistent statements—reversible error

     In a prosecution for second degree murder, the trial court committed
reversible error in allowing the State to impeach its own witness by use of her
prior inconsistent statements. Insofar as the original record showed, the state
did not move to have the witness declared a hostile witness; no voir dire took
place on the issue of the state's surprise; the trial judge failed to specify the
extent to which the prior inconsistent statements could be offered; and the
state used the witness's prior statements to another witness who was not an
official investigator nor someone designated by the district attorney to take a
statement. Further, no limiting instructions were requested or given to inform
the jury that the prior inconsistent statements could not be considered as
substantive evidence of guilt. Because of these omissions from the record, the
Court, on motion of defendant for appropriate relief, ordered a hearing on the
issue of whether "the prosecutor who tried this case was surprised at trial by
the testimony of state's witness so as to be entitled under the rule of *State v.
Pope*, 287 N.C. 505 (1975) to impeach the witness's trial testimony by offering
evidence of prior inconsistent statements allegedly made by her." The
testimony at the hearing showed that the prosecutor "could not have been
genuinely surprised" by the witness's testimony. The court found "a rea-

sonable possibility" that had the error in admitting the statements not oc-
curred a different result might have been reached at trial. G.S. 15A-1443(a).

**2. Homicide § 30.2 — failure to instruct on voluntary manslaughter proper**

In a prosecution for second degree murder, the trial court properly failed
to instruct on voluntary manslaughter where there was no evidence to support
such an instruction.

Justices MARTIN and FRYE did not participate in the consideration or deci-
sion of this case.

BEFORE *Judge Maurice Braswell* at the 18 May 1981 Criminal
Session of DURHAM Superior Court defendant was found guilty of
second degree murder and received a sentence of life imprison-
ment. Defendant appealed pursuant to G.S. 7A-27(a). During the
pendency of this appeal defendant moved for appropriate relief, in
which motion he asked this Court to remand the case to superior
court for a hearing on the issue of the admissibility of certain
pretrial statements made by a witness for the state. The state did
not object to such proceedings, and we allowed the motion on 3
March 1982 pursuant to G.S. 15A-1453(b)(2). On 22 March 1982
*Judge D. M. McLelland* conducted the hearing and made findings
and conclusions. A transcript of the hearing, Judge McLelland's
order, and addenda to the briefs were subsequently filed with this
Court.

*Rufus L. Edmisten, Attorney General, by Lucien Capone III,
Assistant Attorney General, for the state.*

*Clayton & Myrick by Jerry B. Clayton, Ronald G. Coulter
and Robert D. McClanahan, for defendant appellant.*

EXUM, Justice.

Defendant argues in his appeal that the trial court committed
reversible error in permitting the state to impeach its own
witness, in sustaining the state's objections to questions asked of
a character witness for defendant, in failing to submit voluntary
manslaughter as a possible verdict, and in omitting the proximate
cause element from his instructions on involuntary manslaughter.
We conclude defendant is entitled to a new trial on the ground
the trial court erred in allowing the state to impeach its own
witness.

The state's evidence at trial tended to show the following:

State v. Cope

Between midnight and 2:30 a.m. on 1 January 1980, sixteen-year-old Henry Cotton was driving a pickup truck with three passengers on Liberty Street in Durham. The group was on its way home from celebrating New Year's Eve at a local discotheque when Cotton told the others, "A car is right on my tail." One of the passengers noted a headlight on the following car was out. When the truck turned onto Hardee Street, a shot was fired; one of the passengers told the others to duck because someone was shooting at them. Other shots followed. The truck ran off the road and struck a tree. Investigating officers administered first aid to Cotton but could not feel a pulse. In the opinion of the forensic pathologist who performed an autopsy on Cotton, he died from a gunshot wound to the head. A specialist in firearms identification testified the bullet retrieved from Cotton's body was either a .38 caliber or .357 magnum bullet.

Nan Carr was traveling on Hardee Street on 1 January 1980 when she saw the pickup truck hit the tree. Before the truck wrecked she heard three loud noises, which she thought were caused by firecrackers because it was New Year's Eve. She saw a small station wagon with a very long antenna screech away from the intersection. She later saw the same car when it passed by after circling the block. The car had been wrecked and was missing a headlight. The driver of the car "had a long face, very long hair, and a long beard." She saw a passenger in the front seat of the car but could not tell if the person was a man or a woman. Ms. Carr testified she had been hypnotized to help her recall details of the incident.

Johnny Mason testified he was riding with Cathy Teasley and defendant, who was driving Teasley's automobile, in the early morning hours of 1 January 1980. Teasley's automobile was a brown Subaru station wagon that had a long antenna and one headlight burned out. They were leaving the "Midnight Special," a nightspot in Durham. Defendant became angry when a pickup truck pulled in front of him and then made a turn without signaling. As the truck turned defendant rolled down his window; Mason ducked because he thought defendant was going to yell. He heard a shot from inside the car and then heard Teasley scream at defendant. They circled the block and defendant commented the truck had wrecked.

Cathy Teasley testified she was living with defendant in January 1980. They celebrated New Year's Eve at the Midnight Special, where defendant worked. Teasley and Johnny Mason left the Midnight Special with defendant about three or four in the morning. Defendant was driving Teasley's Subaru and Mason was a passenger in the back seat. Although Teasley sometimes had a .357 Magnum in the car, there were no guns in the car that night. Teasley testified that the group went to Randy Mason's house from the Midnight Special, via East Geer Street, and never went to Hardee Street. At that point in her testimony the prosecutor introduced, over defendant's objection, a prior inconsistent statement given to the police by Teasley in which she implicated defendant as the one who fired the fatal shot at Cotton. The rest of her testimony dealt with her relationship to defendant and her explanation of why her testimony at trial differed from her previous statements.

Nan Carr was reexamined, over defendant's objection, about conversations she had with Teasley regarding this case, including one in which Teasley said "she was in the car with the man who shot the deceased." Detective Parham of the Durham Police Department testified about statements regarding this case made by Teasley and Mason. Finally, members of Teasley's family testified about conversations they had with her regarding this case.

Defendant's evidence at trial was primarily directed at establishing an alibi defense. Defendant denied any involvement in the shooting. He testified he worked as a bartender at the Midnight Special on New Year's Eve from approximately 8 p.m. until 4 a.m. He left the bar with Teasley and Johnny Mason and went directly to Randy Mason's house, where they stayed until 10 a.m. Nine other people who were either at the Midnight Special or Mason's home, or both, testified and corroborated defendant's testimony about where he was on New Year's Eve, 1979-80.

[1] The most significant question presented by defendant's appeal is whether the trial court erred in permitting the state to impeach its witness Cathy Teasley by her prior inconsistent statements. We conclude the impeachment was impermissible and constitutes reversible error.

It is our general rule that the state may not impeach its own witness through the use of prior inconsistent statements or

evidence that the witness's character is bad. *State v. Anderson*, 283 N.C. 218, 224-25, 195 S.E. 2d 561, 565 (1973); 1 Brandis, North Carolina Evidence § 40 (2d rev. ed. of Stansbury's N.C. Evidence 1982). An exception to this rule, recognized in *State v. Pope*, 287 N.C. 505, 215 S.E. 2d 139 (1975), allows the state to impeach its own witness when the prosecutor "has been misled and surprised by the witness, whose testimony as to a material fact is contrary to what the State had a *right* to expect." *Id.* at 513, 215 S.E. 2d at 145 (emphasis original). "Surprise" means more than "mere disappointment"; rather it means *"taken unawares." State v. Smith*, 289 N.C. 143, 158, 221 S.E. 2d 247, 256 (1976) (emphasis original).

The Court in *Pope*, in an opinion by then Chief Justice Sharp, suggested a procedure for invoking the "surprise" exception: (1) The state should move "to be allowed to impeach its own witness by proof of his prior inconsistent statements"; (2) the motion should be made as soon as the prosecutor is surprised; (3) the motion "is addressed to the sound discretion of the trial court"; (4) the preliminary questions of whether the prosecutor is surprised and misled as to the witness's expected testimony on a material fact is to be determined in a *voir dire* hearing in the absence of the jury; and (5) "[i]f the trial judge finds that the State should be allowed to offer prior inconsistent statements, his findings should also specify the extent to which such statements may be offered." 287 N.C. at 512-13, 215 S.E. 2d at 145. The Court in *Pope* further noted that prior inconsistent statements are not substantive evidence and are only admitted to show the prosecutor was surprised by the witness's testimony at trial and to explain why the witness was called by the state. *Id.* at 514, 215 S.E. 2d at 146. Finally, in keeping with the limited purpose for which the prior inconsistent statements may be offered, *Pope* said only statements "made . . . to the State's attorney or to some person whom he specifically instructed to communicate the statement to the attorney" or statements taken in writing by official investigators and furnished to the state's attorney may be used to impeach the witness. *Id.* at 513, 215 S.E. 2d at 145.

The original record on appeal did not show whether the prosecutor, Michael Nifong, was surprised by Teasley's testimony at trial. The record sets forth the following exchange which occurred during Teasley's testimony:

I came to the Midnight Special in my car that night. It was a brown Subaru station wagon. I am not exactly sure, but I believe the car was in a wrecked condition as of that night. The wreck damage would have been in the front of the car. I am not sure if I just had one headlight working that night or not. My father and I have discussed it and neither one of us can remember. I did not have a CB antenna on the car that night. I did have a radio antenna that comes up right over the front. When we left the Midnight Special that night, Billy was driving. I was in the passenger seat and Johnny Mason was in the backseat.

I own a 22 caliber pistol that I got from my grandfather's estate when he died. I have never owned a 357 Magnum, but my father has owned one before. I used to take his 357 Magnum with me when I went out of town. I would put it in the car but it was not in the car on this night. I did not have my .22 pistol in the car that night either. There were no guns in the car.

After we left the Midnight Special we went down East Geer Street to Randy Mason's house on Ferrell Road. We never went to Liberty Street or Hardee Street.

MR. NIFONG: Ms. Teasley, you have talked with me about this case before, of course, haven't you?

MS. TEASLEY: And I have told you a lot of stuff.

MR. NIFONG: Have you always told me what you are telling me right now, ma'am?

MS. TEASLEY: I don't know what you mean.

MR. NIFONG: Have you told me from the beginning exactly what you are telling me right now?

MS. TEASLEY: No, sir, but I tried to, and you wouldn't talk to me about it.

.  .  .  .

MR. NIFONG: Would you read the statement please, that you have in front of you marked State's Ex. No. 13.

MS. TEASLEY: It says 'The following is a voluntary statement by Catherine Emma Teasley —

MR. MANSON: OBJECT to reading the statement that she says is not now true.

OVERRULED.

EXCEPTION NUMBER THREE

MR. NIFONG: Go ahead.

Teasley then read a lengthy statement in which she placed defendant at the scene of the shooting and identified him as the one who fired the gun at the truck. After Teasley's examination was completed Nan Carr was recalled to testify about conversations she had had with Teasley. Teasley had stated on cross-examination that she knew the details in her original statement because Carr had told her what some witnesses had said about the case. It was not until the prosecutor attempted to question Carr about her conversations with Teasley that the following exchange was had out of the presence of the jury:

> MR. MANSON: Your Honor, please, I feel at this time that the State is attempting to impeach their own witness Cathy Teasley, who has already testified under direct examination. Miss Teasley gave a written statement which is now in the record, which we know what she said at one time and what she testified to. She testified that she had a great deal to lose by giving the testimony that she gave today, but that was the truth, and she was going to give it, and I don't believe that it is proper for the State to be allowed to impeach one of the State's witnesses who doesn't testify the way the State thinks she should testify. She also testified that she came to Mr. Nifong and tried to tell him what the situation was, but that he did not discuss it with her, and very basically instead of being redundant, I think they are impeaching their own witness, and we OBJECT to it.

> MR. NIFONG: The testimony of Miss Teasley was of more than one variety. She indicated that she had in fact made a statement earlier and read that statement into the record. She then also indicated that she was now saying that statement had been fabricated, that the information that she got from which to fabricate that statement came from this witness. I think that the jury has a right to hear evidence from

which they can determine which of the statements made by Cathy Teasley is true and impeaching one's statement. We are giving credence to the other statement. Her testimony was in fact that she made the written statement earlier. She has made two statements in front of the jury. I think the State has a right to prove to the jury which one of these statements they should believe.

MR. MANSON: May it please the Court, I would like to point out the statement says that 'The above statement is true and correct to the best of my knowledge,' and she signed it on the 13th of February, 1981, not notarized.

COURT: I hold on all of the evidence that is of record to this point that the State's witness, Catherine Emma Teasley, has today by her change of story on direct testimony to become a witness hostile to the State, and that the State had been genuinely surprised by her testimony today in court. . . .

Given the facts and circumstances of this case, it is competent for this witness to now answer the last question which was asked by the State. . . .

[It] is lawful under the Rules of Evidence to overrule the objection, and it is now OVERRULED and she may answer in the presence of the jury.

EXCEPTION NUMBER FOUR

Thus, insofar as the original record shows, the state did not move to have Teasley declared a hostile witness; no *voir dire* took place on the issue of the state's surprise; the trial judge failed to specify the extent to which the prior inconsistent statements could be offered; and the state used Teasley's prior statements to Nan Carr who was not an official investigator nor someone designated by the district attorney to take a statement. In short, the procedure suggested in *Pope* was not followed. Finally, we note that no limiting instructions were requested or given to inform the jury that the prior inconsistent statements could not be considered as substantive evidence of guilt.[1]

---

1. Indeed, it appears that the prosecutor erroneously believed Teasley's prior inconsistent statements could be offered as substantive evidence of what actually happened, rather than merely to impeach Teasley's in-court testimony.

Because of these omissions from the record, this Court, on motion of defendant for appropriate relief filed during the pendency of the appeal and in which the state acquiesced, ordered a hearing on the issue of whether "the prosecutor who tried this case was surprised at trial by the testimony of state's witness Cathy Teasley so as to be entitled under the rule of *State v. Pope, supra,* to impeach Teasley's trial testimony by offering evidence of prior inconsistent statements allegedly made by her." Judge D. M. McLelland conducted the hearing at which Mr. Nifong, two investigators for the state, defendant's trial counsel, and Teasley's counsel in a perjury charge arising out of this case testified.

Nifong testified that Teasley came to see him on the Thursday before trial was to begin on Monday. Teasley told Nifong, without being asked, that she had not been completely honest with him. When he asked her what she meant she responded, "Billy didn't kill that boy." Nifong's first thought was that she was going to confess to the crime; if so, he did not want to become a witness to her confession. He called in an officer to question her further.

The detective, Steve Hall, testified he and another officer accompanying him could not get her to say anything other than that defendant did not kill Cotton, and that her statement was a lie. He told Nifong she had told him she lied about the whole statement. Detective Parham, the investigator assigned to the case, also arrived to question her. Teasley began crying when he walked in, and said something like: "Billy didn't kill the boy, I made it up." He could not get her to change any other specific points in her statement. He also told Nifong he could not get her to say anything other than that defendant did not kill Cotton. Parham told Nifong he did not know what she would say at trial. Finally, Nifong questioned her in the presence of Parham but she would not respond when asked if she wanted to change her statement.

Nifong explained why he called Teasley as a witness even though he anticipated she might not testify that defendant fired the fatal shot. He anticipated an alibi defense in the case, with the defense offering eight or nine witnesses placing defendant somewhere other than at the scene of the shooting during the

relevant time. He believed Teasley's testimony was important to the extent it established the material fact that she, defendant, and Johnny Mason were "at the place where the killing occurred at the time that it happened." Nifong testified he was very surprised by her testimony indicating she and defendant and Mason had not gone near Liberty or Hardee Streets that night. He also testified a conference at the bench was held after Manson's objection in which the question of the state's surprise was discussed. He did not recall making a formal motion for the record to have Teasley declared a hostile witness. He did not recall exactly what was made known to the trial judge about the background of Teasley's change in her testimony but he knew that "in general terms the Judge was apprised of what had occurred."

William Manson, defendant's attorney at trial, testified Teasley came to his office before she went to Nifong's. She told him she had made up the whole story. He advised her to go to Nifong and the police and tell them the truth. He did not know whether she had talked with Nifong or not when the trial began, but he assumed she had not when Nifong listed her among the state's witnesses.

Finally, Thomas F. Loflin, III, who at the time he testified was defending Teasley with regard to a perjury charge brought against her arising from this case, stated that in the course of preparing Teasley's case he asked Nifong why he called her to the stand when she had told him "Billy didn't shoot that man." Nifong said "he knew it was a gamble and taking a risk, but he hoped . . . that she would go back to the written statement that she had originally given Barry Parham, and which she had reiterated to Mr. Nifong."

From the evidence presented at the hearing, Judge McLelland made the following findings:

2. That on Thursday before trial on the following Monday, Teasley told Nifong that she had not been totally honest; that the 'defendant did not kill that boy'; that Nifong then had police investigators Hall and Parham question Teasley, first advising her of her Constitutional rights, as he anticipated the possibility of her confessing that she had fired the shot.

3. That Teasley told police investigators that defendant did not kill that boy, that *she had made up the statement, and that the statement was a lie.*

4. That the investigators asked Teasley to go over the statement and to change what was not true, and that she declined to do so.

5. That Nifong was told by Parham that he did not know what Teasley would say, that she would not tell him anything other than that the defendant did not kill that boy, *that her statement was a lie, and that she had made it up.*

. . . .

8. That Nifong, anticipating the defense of alibi, thereafter called Teasley, *expecting her to corroborate Mason's testimony that the defendant was at the scene of the shooting, but to deny that defendant had fired the shot.*

9. That Teasley testified that she, defendant and Mason were not at the scene of the shooting.

10. That upon defendant's objection to Nifong's request that Teasley read into evidence her pre-trial statement, the Trial Judge at a bench conference determined that Nifong was surprised and overruled the objection. [Emphases supplied.]

From these findings Judge McLelland concluded: "[T]he District Attorney was genuinely surprised by the testimony of the witness Teasley and was properly allowed to impeach her testimony by use of her pre-trial statement."

The prosecutor did testify that he expected Teasley to put defendant at the scene of the crime even if she would not say defendant fired the fatal shot. This testimony forms the basis of Judge McLelland's finding No. 8 and apparently his conclusion that the prosecutor was surprised. Our cases make it clear, however, that the test for prosecutorial surprise is not what the prosecutor actually anticipated; the test is what, under all the circumstances, the prosecutor should reasonably have anticipated.

The appropriate test for determining whether the prosecutor is surprised is whether "the prosecuting attorney knows at the

time the witness is called that he has retracted or disavowed his statement, or has reason to believe he will do so if called upon to testify." *State v. Pope, supra,* 287 N.C. at 514, 215 S.E. 2d at 146. This test and subsequent applications of it in *State v. Moore,* 300 N.C. 694, 268 S.E. 2d 196 (1980); *State v. Lovette,* 299 N.C. 642, 263 S.E. 2d 751 (1980); and *State v. Smith, supra,* 289 N.C. 143, 221 S.E. 2d 247, compel the conclusion that Nifong was not surprised by Teasley's testimony and that Judge McLelland erred in concluding that he was.

In *State v. Smith, supra,* 289 N.C. at 152, 221 S.E. 2d at 252, the prosecutor called as a witness James Thomas, who had testified for the state at the defendant's first trial and who was serving time for an unrelated crime. The day before Thomas was scheduled to testify in the second trial, he told the district attorney he wanted his prison sentence reduced in exchange for his testimony. The district attorney told Thomas he could only write a letter to the Department of Corrections; Thomas at that point apparently became uncooperative. The prosecutor nevertheless called Thomas to the stand; when Thomas began changing his testimony from that given at the first trial the prosecutor asked the trial court to declare Thomas a hostile witness. The district attorney then asked Thomas a number of questions which caused this Court to conclude "that the State was seeking not only to impeach the credibility of its own witness but was also attempting to force the witness to give the jury the same account of events he had given at the first trial. Failing this, the prosecutor intended to accomplish his efforts at impeachment by placing the previous testimony of this witness before the jury." *Id.* at 157, 221 S.E. 2d at 255. Justice Huskins, writing for the Court, concluded:

> In the instant case there can be no doubt that, *sometime prior to calling the witness Thomas,* the district attorney had substantial reason to believe that Thomas would repudiate or disavow his prior testimony if called upon to testify. This being so, the prosecutor could not have been genuinely surprised or taken unawares by the testimony of Thomas. To the contrary, he had every reason to believe that Thomas would retract his previous testimony or feign a loss of memory. Under these circumstances, the district attorney

should have marked Thomas off the list of the State's witnesses.

*Id.* at 158-59, 221 S.E. 2d at 256 (emphasis original). The Court found the trial court's error in permitting the district attorney to impeach his own witness was sufficiently prejudicial to require a new trial of double murder charges against the defendants. *Id.*

In *State v. Lovette, supra,* 299 N.C. 642, 263 S.E. 2d 751, the Court was again confronted with the question whether the state should be allowed to impeach one of its witnesses, Clifford Johnson, in the defendant's trial on charges of second degree murder and attempted armed robbery. The state was allowed at trial, over defendant's objection, "to read from Johnson's pretrial statement . . . and then ask not only about statements made to him by defendant but also about accusatory statements made to defendant by [two other people]." *Id.* at 646, 263 S.E. 2d at 754. Three weeks after Clifford Johnson made his pretrial statement, he informed an officer " 'that he did not want to testify due to the fact that it might get the three people some time and he did not want to be responsible for that.' " *Id.* at 649, 263 S.E. 2d at 756. Before trial Johnson met with the officer and the district attorney. Nevertheless, the district attorney called Johnson and moved to have him declared a hostile witness when Johnson testified, contrary to his pretrial statement, that he had not discussed the incident with the defendant. The trial court found, following a *voir dire,* that the state could cross-examine Johnson based on "surprise." 299 N.C. at 650, 263 S.E. 2d at 756. Justice Huskins, writing for the Court, quoted the rule in *Pope* that before the prosecutor's motion to treat his witness as hostile is granted " 'the court must be satisfied that the State's attorney has been misled and surprised by the witness, whose testimony as to a material fact is contrary to what the state had a *right* to expect.' " 299 N.C. at 649, 263 S.E. 2d at 756 (quoting *State v. Pope, supra,* 287 N.C. at 513, 215 S.E. 2d at 145) (emphasis original). This Court concluded:

> [P]rior to calling the witness Johnson, the district attorney had substantial reason to believe that Johnson would likely repudiate his pretrial statement if called upon to testify. The record strongly suggests that the prosecutor could not have been genuinely surprised or taken unawares by the testi-

mony of Johnson. To the contrary, he knew, or had every reason to believe, that Johnson would not testify consistent with his pretrial statement. Under these circumstances the district attorney was not entitled to impeach his own witness and the court erred to defendant's prejudice in permitting him to do so. *See State v. Pope, supra; State v. Anderson, supra.*

299 N.C. at 650, 263 S.E. 2d at 756.

Finally, in *State v. Moore, supra,* 300 N.C. 694, 268 S.E. 2d 196, an opinion written for the Court by Justice Copeland, defendant was charged with felonious burning of a dwelling house. Glenda Moore was called as a witness for the state. When she was called the trial judge stated the following for the record:

'[I]t is my understanding that the district attorney has been advised and the defense attorney is aware of the fact that there was a statement made by this witness to Captain Reams at some time following the fire. That there is some information in the possession of both the district attorney and the defense attorney that the witness intends to repudiate in whole or in part the statement which she made to Sheriff Reams . . . .'

*Id.* at 699, 268 S.E. 2d at 200. Nevertheless, the trial court declared the witness to be hostile and allowed the state to impeach her. This Court concluded the state clearly "was not misled, surprised or entrapped by the witness'[s] trial testimony and the witness was improperly declared to be a hostile witness in violation of the rule as set forth in *Smith* and *Pope.*" *Id.* at 699, 268 S.E. 2d at 200-01.

The evidence before Judge McLelland tended to show and he found as facts that before trial: Teasley told the prosecutor "defendant did not kill that boy." Teasley told investigators she "had made up" her pretrial statement and "the statement was a lie." One investigator told the prosecutor "he did not know what Teasley would say" and that Teasley had told him "her statement was a lie, and that she had made it up." Armed with this information, the prosecutor clearly "had reason to believe" and should reasonably have anticipated that if Teasley were called she would disavow her pretrial statement. The prosecutor had no reasonable

basis for anticipating that Teasley's trial testimony would place defendant at the scene of the crime, but would deny defendant fired the shot. The prosecutor, therefore, "could not have been genuinely surprised" by Teasley's testimony, *State v. Lovette, supra; accord, State v. Moore, supra.* "Under these circumstances, the district attorney should have marked [Teasley] off the list of the State's witnesses." *State v. Smith, supra,* 289 N.C. at 159, 221 S.E. 2d at 256.

Further, the district attorney should not have been permitted to offer Nan Carr's testimony about prior statements Teasley made to Carr.

These errors entitle defendant to a new trial. The case against defendant is largely circumstantial. Even if the circumstances are considered to point strongly in the direction of his guilt, his alibi defense is likewise strong. Teasley's pretrial statements not only place defendant at the scene of the shooting, they unequivocally identify him as the one who fired the gun at the truck. Even if admissible, the statements could only be used for purposes of impeachment, not as substantive evidence against defendant. *State v. Pope, supra,* 287 N.C. at 514, 215 S.E. 2d at 146. The trial court, however, did not instruct the jury on the limited purpose for which these statements could be used. It is likely that in the absence of such instructions the jury accepted the statements as substantive evidence of what happened.[2] We believe there is "a reasonable possibility" that had the error in admitting these statements not occurred a different result might have been reached at trial. G.S. 15A-1443(a) (1978). Therefore the error is reversible.

We decline, as the state urges, to abolish or modify our anti-impeachment rule. Although we recognize the rule has been criti-

---

2. Had the pretrial statements been admissible for impeachment only, whether failure to so instruct the jury in the absence of a request would have been error is a question not now before us and one we do not now decide. *See State v. Watson,* 294 N.C. 159, 240 S.E. 2d 440 (1978) (limiting instruction on impeaching evidence adduced by *adverse* party's cross-examination must be requested in order to complain on appeal of instruction's absence). Since, however, it was error to admit the statements for any purpose, it is proper to consider the absence of limiting instructions in our assessment of the statement's probable impact on the jury. *State v. Pope, supra,* 287 N.C. at 514, 215 S.E. 2d at 146 (trial court's giving limited instruction on impeaching evidence considered in deciding that error in admission of evidence was not reversible).

cized, it is "accepted as sound law in this State," *State v. Tilley,* 239 N.C. 245, 249, 79 S.E. 2d 473, 476 (1954), and is not lightly to be altered. The rule has been recently applied in *Moore, Lovette,* and *Smith.* We need not now address whether Rule 607[3] of our newly enacted Code of Evidence, H.B. 96, 1983 N. C. Gen. Assem., ch. 701, § 1 (ratified July 7, 1983), will alter our present rules on this subject. Suffice it to say that the new Code does not take effect until 1 July 1984, *id.* at § 3, and has no application to this trial.

[2]  Defendant presents several other questions for review but only one is likely to arise on retrial. Defendant argues the trial court erred in refusing to charge the jury on voluntary manslaughter as a permissible lesser-included offense of second degree murder. We conclude there is no evidence to support such an instruction. The distinction between murder and voluntary manslaughter was set forth in *State v. Wilkerson,* 295 N.C. 559, 579, 247 S.E. 2d 905, 916 (1978) (emphasis added):

> Generally, *voluntary manslaughter occurs when one kills intentionally but does so in the heat of passion suddenly aroused by adequate provocation* or in the exercise of self-defense where excessive force under the circumstances is employed or where the defendant is the aggressor bringing on the affray. Although a killing under these circumstances is both unlawful and intentional, the circumstances themselves are said to displace malice and to reduce the offense from murder to manslaughter. *See generally State v. Potter,* 295 N.C. 126, 244 S.E. 2d 397 (1978); *State v. Ward,* 286 N.C. 304, 210 S.E. 2d 407 (1974), *death penalty vacated,* 428 U.S. 903 (1976); *State v. Wrenn, supra,* 279 N.C. 676, 185 S.E. 2d 129 (Sharp, J., now C.J., dissenting).

"Adequate provocation" may be defined as provocation "of such nature as the law would deem adequate to temporarily dethrone reason and displace malice." *State v. Montague,* 298 N.C. 752, 756-57, 259 S.E. 2d 899, 903 (1979); *State v. Ward,* 286 N.C. 304, 210 S.E. 2d 407 (1974), *death sentence vacated,* 428 U.S. 903 (1976).

---

3. The Rule provides: *"Who May Impeach.* The credibility of a witness may be attacked by any party, including the party calling him." H.B. 96, 1983 N. C. Gen. Assem., ch. 701, § 1 (ratified July 7, 1983).

The only evidence of provocation that defendant can point to is testimony about Cotton's pulling his truck out in front of the car defendant was driving and Cotton's failure to signal before turning. There is ample evidence that these acts made defendant angry. But neither act is of such a nature as "would naturally and reasonably arouse the passions of an ordinary man beyond his power of control." *State v. McLawhorn,* 270 N.C. 622, 628, 155 S.E. 2d 198, 203 (1967) (quoting 26 Am. Jur., Homicide § 22 (1940)). The refusal of the trial court to instruct on voluntary manslaughter was proper since there is no evidence to support such an instruction. *State v. Wilkerson, supra,* 295 N.C. at 583, 247 S.E. 2d at 918.

For the reasons given, the verdict and judgment of the superior court are vacated and the case is remanded for a

New trial.

Justices MARTIN and FRYE did not participate in the consideration or decision of this case.